BOARD OF ZONING APPEALS OF
BARTHOLOMEW COUNTY, Indiana,
Petitioner-Appellant,

v.

Jerry L. FREEMAN, Judith R. Freeman,
and Mabel Whittington,
Respondents-Appellees.

No. 1–781A227.

Court of Appeals of Indiana,
First District.

July 27, 1982.

Harold V. Jones, Jr., Columbus, for petitioner-appellant.

Stephen R. Heimann, Columbus, for respondents-appellees.

NEAL, Judge.

## STATEMENT OF THE CASE

Petitioner-appellant Board of Zoning Appeals of Bartholomew County, Indiana (the Board) appeals from an order of the Bartholomew Circuit Court granting its Application for Mandatory and Permanent Injunction against respondents-appellees Jerry L. Freeman, Judith R. Freeman (Freemans), and Mabel Whittington (Mabel) for storing inoperable motor vehicles, accessory parts, and scrap machinery on their property, and for maintaining a junkyard in violation of the 1958 Zoning Ordinance of Bartholomew, Indiana (Ordinance).

We affirm in part and reverse in part.

## STATEMENT OF THE FACTS

Freemans own a one acre tract of land deeded to them by Mrs. Freeman's mother, Mabel, who owns 87 acres of land which surrounds the Freemans' property on three sides. Freemans own seven or eight inoperable motor vehicles, accessory parts, scrap metal and farm machinery which they have deposited in front of their residence and around their detached garage, all of which is in plain view to the neighbors. The Freemans have lived there for approximately ten years. Mr. Freeman also junked or discarded eighteen or more other inoperable motor vehicles, various automobile parts, scrap metal and junk farm machinery on Mabel's property at a location behind the Freemans' residence.

On August 4, 1958, the Board of County Commissioners of Bartholomew County, Indiana, enacted the Ordinance, classifying the property of Freemans and Mabel as S–1 Suburban Residence District. Under that classification, maintaining a junkyard is impermissable, and therefore, the Board commenced this action against the Freemans and Mabel.

A trial before the court was held on December 17, 1980, and thereafter, on February 19, 1981, the trial court entered its judgment, finding, in part, that 1) a legally enacted zoning ordinance was in effect at the time of the violation; 2) Freemans owned and kept inoperable motor vehicles and parts in public view on their property after passage of the Ordinance; 3) Freemans' and Mabel's property was zoned a residential district; and 4) Freemans and Mabel were maintaining a junkyard after passage of the Ordinance and in contravention of the Ordinance.

Upon the above findings, the trial court ordered:

"1. Jerry L. Freeman and Judith R. Freeman shall remove or cause to be removed any and all automobile parts and any and all automobiles that are not titled, licensed and operable into the accessory building or the attached garage on their property on or before Thirty (30) days from date hereof;

2. Jerry L. Freeman and Judith R. Freeman shall limit the number of non-garaged automobiles on their herein described property henceforth to Four titled, licensed and operable automobiles owned by them except for titled, licensed and operable automobiles of bona fide guests and visitors;

3. Mabel Whittington shall remove or cause to be removed from her real estate herein described on or before Thirty (30) days from date hereof any and all automobile parts or wrecked or junk automobiles and shall henceforth limit the number of non-garaged automobiles on her real estate to three titled, licensed and operable automobiles whether owned by her or not except for titled, licensed and operable automobiles of bona fide guests and visitors."

## ISSUES

The Board presents two issues for review, and the Freemans and Mabel, on cross-appeal, present two issues, all of which we restate as follows:

The Board argues that:

I. The trial court abused its discretion in denying the injunction against Freemans' use of their accessory buildings to restore and repair inoperable vehicles and to keep parts and other scrap metal junk, all of which is in violation of the Ordinance; and

II. The trial court erred in ordering Freemans to remove their inoperable vehicles and vehicle parts into their accessory buildings and in limiting the number of nongaraged, titled, licensed and operable motor vehicles that Freemans and Mabel could own on their premises.

The Freemans and Mabel argue that:

III. The trial court erred in ordering them to remove their motor vehicle parts upon no showing that respondents' activities were endangering the public health, safety, comfort, morals, convenience and general welfare; and

IV. The trial court erred in overruling Mabel's motion for summary judgment since she had stored inoperable machinery, inoperable vehicles and parts on her property prior to the enactment of the Ordinance.

## DISCUSSION AND DECISION

*Issue I. Use of accessory buildings*

The Board argues that the trial court abused its discretion in allowing Freemans to use their accessory buildings (attached and unattached two-car garages) for repair and restoration of inoperable motor vehicles, all in violation of the Ordinance.

■ In an action to enjoin an alleged violation of a zoning ordinance, our standard of review is to determine whether the trial court abused its discretion by failing to grant injunctive relief. *Metropolitan Development Commission of Marion County v. Mullin*, (1979) Ind.App., 399 N.E.2d 751. An abuse of discretion is present only if the trial court's decision is clearly against logic, and the trial court's findings of fact will not be disturbed unless clearly erroneous. *Mullin, supra; Schmidt Enterprises, Inc. v. State*, (1976) 170 Ind.App. 628, 354 N.E.2d 247.

In support of its argument, the Board relies heavily on certain definition and classification sections of the Ordinance and cites *Mullin, supra*; and *Ashley v. City of Bedford*, (1974) 160 Ind.App. 634, 312 N.E.2d 863, for the proposition that car repair and storage activities are not permitted in zoning districts classified residential.

The Freemans' and Mabel's property is zoned an S–1 suburban residence district, and under that classification certain accessory buildings and uses are permitted. Sections 5(1)(a) and 5(8), DEFINITIONS, of the Ordinance define accessory building and use as follows:

"1. ACCESSORY BUILDING AND USE.

(a) A building or use subordinate to another structure or use located on the same lot and which does not change or alter the character of the premises and which is not used for human occupancy.

(b) Public utility communication, electric, gas, water and sewer lines, their supports and incidental equipment, and public telephone booths.

\* \* \* \* \* \*

8. BUILDING, ACCESSORY—A subordinate building, or a portion of a main building, the use of which is incidental to that of the main building."

Section 9 of the Ordinance, which the Board also relies upon, provides:

"USE. No building or land shall be used and no building shall be erected, reconstructed or structurally altered, which is arranged, intended or designed to be used for any purpose other than a use which is permitted and specified in a district in which such building or land is located."

Based upon these definitions, the Board contends that the Ordinance clearly does not permit the use of an accessory building for the repair and restoration of inoperable vehicles in a residential-zoned district. The Board argues that there is no subordinate or incidental relationship, as the Ordinance contemplates, between a suburban residence and an accessory building which is used for car repairs, citing *Mullin, supra,* and *Ashley, supra,* as additional authority.

In *Mullin,* a zoning ordinance set forth certain restrictions on land owners living within a residential district, namely that the primary use of the dwelling unit must be residential. The defendant primarily used his residence as an insurance business. The court found that he was in violation of the ordinance, having converted his residence into a business office.

In *Ashley,* the defendant violated a zoning ordinance by operating a wrecker service and automobile repair business in a residential district. In both *Ashley* and *Mullin,* as Freemans point out in their brief, the defendant was conducting a commercial business in a district zoned residential.

In the case at bar, Mr. Freeman testified that he did not sell any automotive parts to others, but only kept spare parts for his own use in repairing his own vehicles. He further testified that he never repaired other people's automobiles and he only fixed up his old cars as a hobby.

■ Unlike *Mullin* and *Ashley,* the Ordinance does not provide any specific restrictions or limitations on the *use* of accessory buildings. Repairing private cars in a residence district is not a prohibited activity under the Ordinance. None of the sections of the Ordinance cited above and relied upon by the Board restrict the use of accessory buildings for private car repair in a residence district. Certainly, the use of an accessory building for repairing and restoring private cars is not prohibited by language such as: "a use which is incidental to that of the main building." Nowhere are incidental uses of accessory buildings in residence districts defined, limited or restricted within the Ordinance. In light of the evi-

dence we cannot say that the trial court's decision ordering Freemans to keep their inoperable vehicles and parts thereof in the accessory buildings is clearly against logic or contrary to law.

*Issue II. Indoor junkyard and limit on number of operable vehicles*

■ In a related argument to its first contention, the Board argues the evidence established that Freemans and Mabel were maintaining a junkyard in violation of the Ordinance. The trial court's order that Freemans and Mabel shall remove the inoperable vehicles and parts into their accessory buildings, in effect, allows them to continue a junkyard indoors. The Board also challenges that the trial court's decree changes the character of private garages into public garages.

Under the Ordinance, a junkyard is defined as follows:

"28. JUNKYARD, INCLUDING AUTOMOBILE WRECKING—A lot or a part thereof used for the storage, keeping, dismantling, abandonment or sale of junk, scrap metal, scrap vehicles or scrap machinery or parts thereof."

As the Freemans note, the definition of a junkyard does not contemplate the storage of inoperable vehicles within the confines of an accessory building. A junkyard is "[a] lot or a part thereof." Under the Ordinance, a lot is defined as follows:

"31. LOT—A parcel, tract or area of land that fronts on a street or place. It may be a single parcel separately described in a deed or plat which is recorded in the office of the County Recorder, or it may include parts of, or a combination of such parcels when adjacent to one another and used as one. In determining lot area and boundary lines no part thereof within the limits of a street shall be included."

We agree with the Freemans that the space within a building does not fall within the definition of a lot, and thus, the Ordinance does not contemplate an indoor junkyard.

Under Sections 5(22) and 5(23) of the Ordinance, private and public garages are defined:

"22. GARAGE, PRIVATE—An accessory building with capacity for not more than three (3) motor vehicles per family, not more than one (1) of which may be a commercial vehicle of not more than three (3) tons capacity. A garage designed to house two (2) motor vehicles for each family housed in an apartment shall be classified as a private garage.

23. GARAGE, PUBLIC—Any building, or premises, except those defined herein as a Private Garage, used for the storage, or care of motor vehicles, or where such vehicles are equipped for operation, repaired, or kept for remuneration, hire or sale."

The Board asserts that since Section 5(22) defines a private garage as an accessory building with a capacity for not more than three automobiles, the trial court, in ordering the Freemans to remove all the inoperable vehicles and parts into the two accessory buildings, turned the accessory buildings into public garages.

■ As the Freemans point out, a private garage is an accessory building *with capacity for* not more than three motor vehicles. The evidence shows that the Freemans' accessory buildings are both two-car garages. The definition of private garage refers to capacity alone, there is no mention of specific permitted uses or restrictions on private garages in residence districts. The Freemans' garages are in full compliance with the capacity requirements for a private garage as defined under the Ordinance. Therefore, the trial court's decision ordering the Freemans to remove all inoperable vehicles and parts into the accessory buildings did not alter or change the character of a private garage as defined under the Ordinance.

The Board raises as a final error the trial court's limitation on both the Freemans and Mabel of the number of nongaraged, titled, licensed and operable motor vehicles they could own on their premises. The Board simply argues that such a limitation is not provided for in the Ordinance.

Restated, that portion of the trial court's order limiting the number of vehicles the Freemans and Mabel could own reads as follows:

" * * *

2. Jerry L. Freeman and Judith R. Freeman shall limit the number of non-garaged automobiles on their herein described property henceforth to Four titled, licensed and operable automobiles owned by them except to titled, licensed and operable automobiles of bona fide guests and visitors;

3. Mabel Whittington shall remove or cause to be removed from her real estate herein described on or before Thirty (30) days from date hereof any and all automobile parts or wrecked or junk automobiles and shall henceforth limit the number of non-garaged automobiles on her real estate to three titled, licensed and operable automobiles whether owned by her or not except for titled, licensed and operable automobiles of bona fide guests and visitors."

The Freemans agree with the Board that nothing in the Ordinance restricts or limits the number of nongaraged vehicles a land owner may own in an S–1 suburban residence district. However, the Board argues that the trial court's order represents a compromise between the requirements of the Ordinance and the facts of the present case. As such, the trial court's decision erroneously creates a zoning restriction where none exists under the Ordinance.

■ Upon our careful inspection of the Ordinance, we agree with the parties that nowhere under the Ordinance is that portion of the trial court's order substantiated which limits the number of nongaraged, titled, licensed and operable vehicles a land owner may keep on his premises. The wisdom for enacting a zoning ordinance is the function of a city's common council, and not the function of the trial court. *Theta Kappa, Inc. v. City of Terre Haute,* (1967) 141 Ind.App. 165, 226 N.E.2d 907. Generally,

the court will not reverse the decision of the Board of Zoning Appeals where there is evidence to support it, nor will the court substitute its own judgment for that of the Board. *Fryer v. City of New Albany,* (1963) 135 Ind.App. 454, 194 N.E.2d 417. Therefore, we hold that the trial court erred in that portion of its order limiting the number of nongaraged, titled, licensed and operable vehicles respondents could own and we order the trial court to modify its judgment accordingly.

*Issue III. Endangering the public health, welfare, etc.*

On cross-appeal, the Freemans and Mabel properly raise two errors in their appellees' brief. First, the Freemans contend the Board failed to introduce any evidence proving that the storage of inoperable vehicles and parts on their property endangered the public health, safety, comfort, morals, convenience and general welfare, as alleged by the Board.

In its Application for Mandatory and Permanent Injunction, the Board alleged that the Freemans' activities, if unchecked, "will be detrimental to the public welfare of the citizens of Bartholomew County, Indiana." The Freemans argue that the burden was upon the Board to present evidence of harm to the public in order to prevail on their cause of action. They further argue that there was no showing of a harm to the public health, and therefore, the trial court should not have ordered the Freemans and Mabel to remove the inoperable vehicles and parts.

In the Board's cause of action against the Freemans, it alleged and prayed for the following:

"* * *

8. That if respondents are permitted to maintain said junkyard including automobile wrecking, and the use of an accessory structure in connection therewith, said acts of the respondents will cause great harm to the citizens of Bartholomew County, Indiana, will be detrimental to the public welfare of the citizens of Bartholomew County, Indiana, and are in violation of the aforementioned Ordinance for which there is no adequate remedy at law to correct.

WHEREFORE, the petitioner respectfully requests and prays that an order be issued by this Court compelling the respondents to clear and remove all junk, inoperable vehicles and junk automotive parts, or other such materials on said lots, and restraining the respondents from continuing the operation and maintenance of said junkyard, including automobile wrecking, and the use of the accessory structure in connection therewith, and from bringing any further material or junk onto said real estate for the purpose of engaging in the junk or automobile wrecking business and the use of the accessory structure in connection therewith, and any other use in violation of the Bartholomew County Zoning Ordinances upon the within described real estate, and that all other necessary and proper relief be given in the premises."

■ The above cited allegations and prayer taken from the Board's claim shows that it proceeded against the Freemans on two theories: 1) that Freemans' activities were detrimental to the public health, and 2) that Freemans were maintaining a junkyard in violation of the Ordinance. As the Board points out, an allegation and proof of a valid ordinance and evidence establishing a violation of that ordinance will sustain a suit for injunction against a land owner. *Spurling v. Area Plan Commission of Evansville,* (1978) Ind.App., 381 N.E.2d 507.

Ind.Rules of Procedure, Trial Rule 54(B) provides, in relevant part:

"Judgment upon multiple claims or involving multiple parties. When more than one [1] claim for relief is presented in an action, . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims . . . ."

■ Proof of either of the Board's theories would be sufficient to uphold the trial court's order of injunction. The Ordinance provides under *Section 19.* CONDITION-

AL USES AND PROCEDURE that a junkyard may be permitted only in Classification 11 and 12 industrial districts. The Ordinance also provided that all junkyards "must be enclosed by building or solid wall or fence 8 feet high."

█ The evidence disclosed that there were numerous inoperable vehicles, "dog houses" (automobile front fenders lying on the ground without the support of wheels), scrap machinery of various kinds and other automotive parts deposited outside Freemans' residence and surrounding their garages, all in open view to the neighbors. From this evidence, the trial court correctly found that the Freemans were in violation of the Ordinance. The injunction order against the Freemans is not infirm.

*Issue V. Summary judgment*

Mabel argues that her motion for summary judgment should have been granted because she had stored inoperable vehicles on her property prior to the adoption of the Ordinance. Therefore, she maintains, the depositing of these inoperable vehicles, scrap metal and parts on her property represents a preexisting legal, nonconforming use of her property.

"The purpose underlying the summary judgment procedure is to terminate those causes of action which have no factual dispute and which may be determined as a matter of law. This procedure is an aid in eliminating undue burdens upon litigants and exposing spurious causes. However, the summary judgment procedure must be applied with extreme caution so that a party's right to the fair determination of a genuine issue is not jeopardized; here improbability of recovery by the plaintiff does not justify summary judgment for a defendant. *Bassett v. Glock* (1977), Ind.App., 368 N.E.2d 18, 20–21.

The summary judgment procedure is an application of the law to the facts when no factual dispute exists. The party seeking the summary judgment, therefore, has the burden to establish that there is no genuine issue as to any material fact. Any doubt as to a fact, or an inference to be drawn therefrom, is resolved in favor of the party opposing the motion for summary judgment. *Poxon v. General Motors Acceptance Corp.* (1980), Ind.App., 407 N.E.2d 1181, 1184.

\* \* \* \* \* \*

... In reviewing a grant of summary judgment, this Court uses the same standard applicable to the trial court. *Richards v. Georg Boat & Motors, Inc.* (1979), Ind.App., 384 N.E.2d 1084, 1090 (*trans. denied*). We must reverse the grant of a summary judgment motion if the record discloses an unresolved issue of material fact or an incorrect application of the laws to those facts."

*Michael Jones v. City of Logansport et al.,* (1982), Ind.App., 436 N.E.2d 1138 at 1143.

Mabel testified that Mr. Freeman had been storing vehicles and automotive parts on her property since around 1958. Mabel also testified that she does not drive cars and does not know how many or what kind of inoperable vehicles Mr. Freeman has stored and presently stores on her property. The Ordinance defines a preexisting nonconforming use of property as follows:

"54. USE, NONCONFORMING—An existing use of land or building which fails to comply with the requirements set forth in this ordinance applicable to the district in which such use is located."

The Ordinance was adopted in August, 1958. As the trial court stated in *Ashley, supra,* at 636, 312 N.E.2d 863:

"Proof of a pre-existing non-conforming use constitutes a defense to an action alleging the violation of a zoning ordinance, assuming that such use has not been terminated under the terms of the ordinance. The burden of proving the non-conforming use rests upon the party asserting its existence, in this case Ashley. *See, O'Banion v. State ex rel. Shively* (1969), 146 Ind.App. 223, 253 N.E.2d 739."

The trial court's injunction order in the case at bar included the following finding:

"8. On March 14, 1980, and at other times before and after that date there were present on the property of the Respondent Whittington numerous automobiles in various state of repair and operability and automobile parts and such presence of such items constitutes a 'junk yard' in contravention of the provisions of the Zoning Ordinance herein above mentioned *and which placement on such property occurred after the enactment of the subject Zoning Ordinance*[.]" (Emphasis added.)

There is evidence to support the trial court's finding that the depositing of inoperable vehicles on Mabel's property by Mr. Freeman began after the Ordinance was enacted.

"An alleged non-conforming use must be shown to have existed on the date the relevant zoning classification becomes effective. It is not sufficient to show that such a use merely existed at some time prior to that date. *O'Banion v. State ex rel. Shively, supra.*"

160 Ind.App. at 638, 312 N.E.2d 863.

■ Clearly a genuine issue of material fact exists as to whether the alleged non-conforming use occurred before, on or after the adoption of the Ordinance. The trial court correctly denied Mabel's motion for summary judgment.

We reverse that portion of the trial court's judgment limiting the number of titled, licensed, and operable vehicles the Freemans and Mabel may keep on their premises; in all other aspects the judgment is affirmed.

Judgment affirmed in part and reversed in part.

RATLIFF, P. J., and ROBERTSON, J., concur.