522 S.E.2d 153

**CITY OF MYRTLE BEACH, Appellant/Respondent,**

v.

**JUEL P. CORPORATION and Gay Dolphin, Inc., Respondents/Appellants.**

**No. 3049.**

Court of Appeals of South Carolina.

Heard Sept. 9, 1999.
Decided Sept. 20, 1999.
Rehearing Denied .Dec. 4, 1999.

159

160

162

Michael W. Battle, of Battle & Vaught, of Conway, for appellant/respondent.

Howell V. Bellamy and Douglas M. Zayicek, both of Bellamy Law Firm, of Myrtle Beach, for respondents/appellants.

ANDERSON, Judge:

The City of Myrtle Beach (the City) brought this action against Juel P. Corporation and Gay Dolphin, Inc. (Gay Dolphin) seeking an order requiring Gay Dolphin to remove a rooftop billboard sign. The Master: (1) refused to issue the injunction; and (2) determined the City was not estopped from claiming the sign had been abandoned. Both parties appeal. We affirm in part and reverse in part.

## FACTS/PROCEDURAL BACKGROUND

The disputed sign was originally erected sometime in the 1970's. Justin W. Plyler (the father), who operates Gay Dolphin, acquired the Ed's Hobby Shop property in the early 1970's "primarily for the sign location.... You can see it for seven or eight blocks."

## I. 1979 ZONING ORDINANCE

In 1979, the City enacted a zoning ordinance which prohibited rooftop signs in certain areas of the City, including the area where the sign was located. Section 902.8.3 of the zoning ordinance provided that rooftop signs had an amortization period of 3 years.[1] Frances M. Savageau[2] explained the sign "was an illegal sign at the passing of the Code with an amortization schedule of three years to allow, to compensate for the removal." Lyle Kershner[3] testified the rooftop sign would have been amortized out by 1985: "Three years after the effective date according to the Ordinance." Wayne Owens, the Code Inspector for the City, believed that based on the amortization schedule for nonconforming signs, this sign "should have been down for sometime before [Hugo]." Savageau maintained: "The sign should have come down."

The father was on the Zoning Board for fourteen years. For twelve of those years, the father was the chairman. Justin A. Plyler (the son) served on the Community Appearance Board for ten years from about 1981 until 1991.

## II. 1985 NOTICE

Savageau attested he wrote a letter to Kay Plyler Brandon (the daughter), the owner of the sign at the time, in 1985. The letter instructed the sign was "an illegal sign ... for many reasons."

> After lengthy legal procedures ... the system down through District Court, declared our Ordinance to be legal, constitutional, and enforceable. Pursuant to that decision and the provisions of the Section 24.7.3 (Amortization of Non–Conforming Signs) of the Ordinance, roof mounted billboards or outdoor advertising structures must be removed after three (3) years of adoption of the Code.

---

1. That part of the ordinance is followed by a parenthetical implying the version of this section in the record on appeal was enacted in October 1995. Based on the testimony of Savageau and Kershner, however, a similar provision apparently existed in the earlier versions.

2. Frances M. Savageau is the Director of Construction Services for the City of Myrtle Beach. From 1979 until 1986, he was a Code Inspector for the City. From 1986 until 1988, he was a Zone Administrator.

3. Lyle Kershner is Zoning Administrator for the City of Myrtle Beach.

Since the Ordinance adoption date was August 9, 1979, the amortization for the billboard mounted on the roof of 702 Main St. must be removed within sixty (60) days of receipt of this notice.

On October 8, 1985, National Advertising wrote the City responding to the City's September 25th letter:

Subsection 195 of Chapter 25 of the South Carolina statutes concerning outdoor advertising require[s] that just compensation be paid by the governmental authority removing or causing to be removed, a lawfully erected sign located in view of an interstate or Federal Aid Primary highway.[4] ... I would appreciate a response from either you or the City Attorney as to whether you concur with my reading of this provision. I am not aware of any offer to pay just compensation for the removal of this structure, which is located on an FAP highway.

The City neither responded to this letter nor took any action to have the sign removed. The father said: "I heard nothing from [the City] ... They evidently changed their mind or backed off from their position, because—unless they had to pay compensation."

### III. 1989/HURRICANE HUGO

When Hurricane Hugo began threatening the South Carolina coast, Gay Dolphin removed the sign facing. The sign structure, however, remained atop the building. Hurricane Hugo made landfall in the early morning hours of September 22, 1989. Shortly after the storm, someone associated with the sign received a letter from the City stating the sign could not be replaced because it was more than 50% damaged.[5] On September 29, 1989, The Department of Highways and Public Transportation (the Department) wrote:

---

**4.** Notwithstanding any other provision of law, in no case shall the State or any county, municipality, local zoning authority, or other political subdivision remove, or cause to be removed, any sign located in view of an interstate or federal-aid primary highway and lawfully erected under the laws of the State of South Carolina without paying just compensation.

S.C.Code Ann. § 57–25–195 (Supp.1980).

**5.** The father explained that after Hurricane Hugo, "[w]e got a letter from the City very shortly after the storm ... I've spent over a hundred

[N]ew regulations affecting maintenance and repair to signs went into effect on June 9, 1989. Under 63–350(7) of these Regulations, very specific guidelines are set forth regarding signs suffering damage in excess of normal wear. *THESE SIGNS CANNOT BE REPAIRED UNTIL THE DE-PARTMENT IS NOTIFIED BY YOU IN WRITING OF THE EXTENT OF THE DAMAGE, THE REASON FOR THE DAMAGE, AND PROVIDING A DESCRIPTION OF THE REPAIR WORK TO THE (sic) DONE, INCLUD-ING THE ESTIMATED COST OF REPAIR.*

You will then receive written notice from the Department authorizing or denying the repair work as requested. *ANY SIGN WHICH IS REPAIRED WITHOUT DEPART-MENT AUTHORIZATION BECOMES ILLEGAL* regardless of the extent of damage.

On October 26, 1989, Gay Dolphin responded to the Department:

In reference to the enclosed letter, our sign located at the intersection of Highway 501 and West Broadway was slightly damaged by Hurricane Hugo. The panels had been removed in anticipation of Hugo, but the three wooden dolphins extending above the sign on metal poles were bent over by the wind. These need to be straigntened (sic) and the metal welded in two places.[6] The cost of repairs is

_____

hours looking through boxes to find that letter and I cannot find it .... saying that our sign was damaged more than 50 percent and therefore we could not replace the fascia on it." John Tinker, an employee of Coastal Outdoor Advertising, testified: "Mr. Owens had sent me a letter ... and said that we should not be doing the work et cetera on the billboard that it, that it was damaged by more than, than 50 percent." Similarly, Ed Fanjoy, who has an "interest" in Ed's Hobby Shop, testified "we was notified that it was nonconforming because it had more than 50 percent damage." Gale Mary Eidson, an employee of Gay Dolphin, and the son confirmed the existence of the letter.

Owens, however, could not remember inspecting the sign following Hurricane Hugo, nor was there any record that he had done so. Savageau testified he did not recall writing any letters to the father, the son or the daughter regarding the sign damage after Hurricane Hugo. Like the other City officials, Kershner could find no record of any damage assessment on the sign. "I have not ever seen such a letter."

6. Fanjoy testified that after Hugo, Tyson "went out and took the dolphins off the sign for me to get that part of the sign safe." The

approximately $200.00.[7]

We cannot ascertain from the record whether Gay Dolphin obtained the required permit from the Department.

As to the assessment of more than 50% damage, the father, claimed "maybe 10 percent" of the sign was damaged. When asked: "Was it clear in your mind that you thought you had the right to put your sign back?", he responded: "Absolutely."

To challenge this damage assessment, the son "went out and got three sign companies to give me a bid on [repairing the sign] and it turns out that they're all willing to say that it was only 10 percent [damaged]." Armed with this information, the son spoke with Savageau seeking permission to put the sign back up. The son testified Savageau told him " 'No.' " Thereafter, the son had no other meetings with Savageau about the matter. Instead, the son and the father "decided to talk to Tom Leath and see what he would say about it."

Although the son admitted he knew a decision of the Community Appearance Board becomes final unless it's appealed and was aware of the procedure for appealing such decisions, he arranged a meeting with Leath in lieu of an appeal. The son explained the topics of discussion in the meeting with Leath:

Just compensation and the fact that whether or not the sign was damaged.... We had [another] problem on Ocean Boulevard of some type that required us to talk to Tom Leath. And at that time we brought up the sign and asked whether or not we could smooth things over.... We didn't want to have any bad blood but if a roof-top sign was the problem that we could install a unipole, and all we wanted was the ability to work off some of the exorbitant cost of doing that to satisfy them by adding another face.

The son professed that during the meeting, Leath "said, 'Well, you know, we want to get rid of the rooftop.' "

others had implied only the sign panels had been removed and that some welding would repair the dolphins.

7. The son testified the sign was worth five or six thousand dollars. A two hundred dollar damage estimate would be less than 50% of the value of the sign.

Q: What did [Leath] propose to you that would settle the matter?

A: Putting up a unipole [with] . . . One face.

Q: All right, sir. And what did you propose to him alternatively?

A: I told him we were suffering. We had too many expenses. If we could get two faces, it would help us a lot.

Q: So, you had two propositions on the table?

A: Exactly.

Q: The proposal he made to you, did you rely on what he told you?

A: Absolutely. He was the City Manager. . . . We had the understanding that he was going to get back to us and give us an answer on it, on, on, on that situation and *if he didn't our alternative was, we were going to put the sign back up.*

(Emphasis added).

The father similarly explicated: "I was aware that the City was anxious to get the rooftop signs down and I wanted to see if there was someway we could maybe comply with that and not, not create a financial loss." "[I]f the city would make it feasible to get the sign off the roof and give us a couple of faces on a pole, we would be glad to work with them, you know." But the—I had no intentions of taking the sign down until we got just compensation for it."

After no response from Leath, the son explained: "Rather than going back I thought it would be prudent to get someone else involved so I would have a witness." The son and John Tinker agreed to "lease [Tinker] the board for two years if he would take the heat and get it smoothed out." Tinker then went to see Leath. According to the son, Tinker reported he felt the City would "probably settle or compromise, allowing us to have a uni-pole there if we would just take down the roof-top sign." Even so, the son expounded, "we felt like we had the right to put that sign up there."

For about five years after Hurricane Hugo there was no sign on the structure. Neither Savageau or Kershner knew of any negotiations with Leath. The City has not paid any compensation to Gay Dolphin.

## IV. 1994

In October 1994, Owens asserted, after noticing a crane truck apparently preparing to replace the sign, he "call[ed] Mr. Mark Stocks ... and asked him ... what was going on there ... [H]e indicated to me that they were getting ready to put a face on it, and I—'Well, you're not permitted to do that. You have no permit to do that.' " The truck immediately left.

On October 25, 1994, the City issued a Notice of Violation for the rooftop sign atop Ed's Hobby Shop. The notice instructed: "Sign atop Ed's Hobby Shop is not a permitted sign and should be removed within twenty-four hours." Owens also contacted Mark Stocks.[8]

After being told they could not replace the sign, Stocks stated: "We stopped our operation at that time and went back and checked the Code, made the determination that we had—I think I talked to [the son] and/or [the father], at that time, and made the determination that there was no legal premise of why we couldn't put the sign face back up, and so we continued and put the sign face back up."

The City followed up with a letter dated November 8, 1994:

On September 12, 1994, it was noted that Peterson Outdoor Acquisitions (P.O.A.) was in the process of installing a sign face at Ed's Hobby Shop on Main Street. Mr. Mark Stocks, P.O.A. Real Estate Manager was notified by me that roof top signs were no longer permitted. The work was discontinued.

On October 25, 1994, it was reported that a sign face had been installed on the existing sign frame, which had been vacant since sometime in 1985. The sign face was an advertis[ment] for MOTION MASTER. A violation notice was given to MOTION MASTER requesting that the sign be removed. On that same date, Mr. Stocks of P.O.A. was again contacted and indicated that his company had installed the sign face.

---

**8.** Mark Stocks is a Real Estate Manager at Universal Outdoor f/k/a POA f/k/a Peterson Outdoor Advertising f/k/a Tyson & Van Outdoor. In that capacity, he secures land leases. His employer leased the location from the Plylers to install the Ripley's Believe It or Not sign on the top of Ed's Hobby Shop.

Section 902.4.8 of the City of Myrtle Beach Zoning Ordinance,[9] prohibits any sign which extends above the building roof line. Therefore, the sign face atop Ed's Hobby Shop should be removed within fifteen days of receipt of this notice.

Even though the father was not receiving any income from the rental of the billboard between 1989 and 1994, he accounted for the five year delay: "Well, I was just waiting to hear from [Leath] and [the City] took no action.... I had no urgency about putting the sign up...." Further, "Because I ... didn't want to rock the boat and ... I believed ... Leath ... was going to give us what we wanted."

The City filed this complaint on March 15, 1996. The Master found because the sign was erected prior to the sign ordinance, Gay Dolphin "has vested rights from the abandonment ordinance," and, therefore, the City "cannot rely on its sign ordinance as the basis for its abandonment claim, because doing so would deprive the sign of its vested rights." Further, the Master ruled Gay Dolphin did not intend to abandon its sign. Accordingly, the injunction was denied. Alternatively, the Master found if the sign was deemed abandoned, the City was required to compensate Gay Dolphin.

## ISSUES

I. Did the Master err in finding the ordinance retroactively deprived the sign owners of its vested rights?

II. Did the Master err in requiring proof of intent to abandon under the ordinance?

III. Did the Master err in requiring a specific 90–day period be calculated for the abandonment of the sign?

IV. Did the Master err in finding a permit was not required to replace the sign because it was normal maintenance to replace the sign facing, and the City failed to provide notification that the sign was deemed abandoned?

---

9. That section provides: "The following signs are prohibited in the City of Myrtle Beach.... Except in the AC–3 district, the following are prohibited: 1. Any sign or sign structure other than freestanding, any portion of which extends above the top of the wall parapet, building roof line or canopy against which said sign is located...."

V. Did the Master err in finding that the City should not be estopped from claiming the sign was abandoned?

VI. Did the Master err in requiring the payment of just compensation if the ordinance applied and the sign was deemed abandoned?

## STANDARD OF REVIEW

 Actions seeking relief by injunction are equitable in nature. *O'Shea v. Lesser*, 308 S.C. 10, 416 S.E.2d 629 (1992); *Airfare, Inc. v. Greenville Airport Comm'n*, 249 S.C. 265, 153 S.E.2d 846 (1967). Therefore, since a Master heard this equitable action without appeal to the Circuit Court, this Court may view the evidence to determine facts in accordance with its own view of the preponderance of the evidence. *Townes Assoc., Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976); *Wilder Corp. v. Wilke*, 324 S.C. 570, 479 S.E.2d 510 (Ct.App.1996), *aff'd*, 330 S.C. 71, 497 S.E.2d 731 (1998); *Friarsgate, Inc. v. First Fed. Sav. & Loan Ass'n*, 317 S.C. 452, 454 S.E.2d 901 (Ct.App.1995). However, we are not required to disregard the findings of the Master. Nor are we required to ignore the fact that the Master, who saw and heard the witnesses, is in a better position to evaluate their credibility. *Tiger, Inc. v. Fisher Agro, Inc.*, 301 S.C. 229, 391 S.E.2d 538 (1989); *Cherry v. Thomasson*, 276 S.C. 524, 280 S.E.2d 541 (1981); *Freeman v. Freeman*, 323 S.C. 95, 473 S.E.2d 467 (Ct.App.1996).

## LAW/ANALYSIS

### I. Vested Rights and Abandonment

 The City argues the Master erred by finding the ordinance discussing abandoned and obsolete signs did not apply. We agree. The relevant ordinance provides:

a. Any sign which advertises or pertains to a business, product, service, event, activity or purpose which is no longer conducted or that has not been in use for three months or which is no longer imminent, or any sign structure that no longer displays any sign copy shall be deemed to be an obsolete or abandoned sign.

b. Signs associated with businesses which are normally open only on a seasonal basis shall not be considered to be obsolete or abandoned, provided there is clear intent to continue operation of the business within nine months. Similarly, permanent signs applicable to a business temporarily suspended because of a change of ownership or management shall not be deemed abandoned or obsolete unless the property remains vacant for a period of six months or 12 months if the signs otherwise conform to all provisions of this ordinance.

c. Obsolete or abandoned signs, sign copy or sign structures are prohibited and shall be removed by the owner of the property, his agent, or person having the beneficial use of the building or site upon which sign or sign structure is erected within 30 days after written notification from the building inspector. Notice shall be provided in accordance with the procedural guidelines specified in Section 902.4.6 hereinabove.[10] In the event of noncompliance with the aforesaid terms and provisions, the city shall remove such signs at the expense of the property owner.

d. When any sign is relocated, made inoperative, or removed for any reason, except for maintenance, all structural components, including the sign face and sign structure, shall be removed or relocated with the sign. All structural components of freestanding signs shall be removed to ground level. The structural components of all other signs, including painted wall signs, shall be removed back to the original building configuration.

Myrtle Beach Code § 902.4.7.

The Master found the City could not rely on this ordinance, because doing so would retroactively deprive Gay Dolphin of its vested rights. The City admits that a property owner retains the right to use their property in a nonconforming manner even after an ordinance is passed. Nevertheless, the

---

**10.** That section provides: "[T]he building inspector ... shall give notice to the property owner ... The person(s) so notified shall remove ... such sign within 15 days of such notice ... If the person(s) so notified fail or refuse to remove ... such sign within the time periods specified hereinabove, then the building inspector may cause such sign to be removed ... at the expense of the owner of the property upon which it is located." Myrtle Beach Code § 902.4.6(b).

City asserts the ordinance was not applied retroactively to deprive Gay Dolphin of any of its rights, but applied appropriately to determine the sign had been abandoned. We agree.

South Carolina recognizes the authority of municipalities, in exercising their police power, to enact zoning ordinances which restrict the use of privately owned property. *See* S.C.Code Ann. § 5-7-30 (Supp.1998); *Peterson Outdoor Advertising v. City of Myrtle Beach,* 327 S.C. 230, 489 S.E.2d 630 (1997); *James v. City of Greenville,* 227 S.C. 565, 88 S.E.2d 661 (1955). However, as enunciated in *Conway v. City of Greenville,* 254 S.C. 96, 173 S.E.2d 648 (1970):

> We have held that, while a municipality has authority in the exercise of the police power to enact zoning ordinances restricting the use of privately owned property, such power is not unlimited and does not permit a municipality to impair or destroy vested property rights acquired prior to the annexation of property to the city.
>
> . . . .
>
> We recognize that the adoption of zoning ordinances is a legislative function and that a wide discretion rests with the governing authority of the municipality in determining the wisdom or expediency of such legislation. However, the determination of whether such ordinances deprive a citizen of constitutional rights is a judicial function and not legislative. And where an ordinance is clearly violative of constitutional rights, it is the duty of the court to so hold.

*Id.,* 254 S.C. at 101, 173 S.E.2d at 650.

Nonetheless, in the case *sub judice,* the City is arguing the ordinance is not applying retroactively to deprive Gay Dolphin of its ability to continue the nonconforming use of the sign. It argues the vested right may be lost through abandonment. We agree.

In *Conway, supra,* the Supreme Court continued: "It is well settled that the right to continue a nonconforming use may be lost by abandonment." This Court in *Gurganious v. City of Beaufort,* 317 S.C. 481, 490, 454 S.E.2d 912, 917-18 (Ct.App.1995) held:

> Once a valid zoning ordinance is enacted based upon a comprehensive zoning plan, it is generally recognized that

nonconforming uses detract from the public purpose to be achieved by the plan. *Bailey v. Rutledge*, 291 S.C. 512, 354 S.E.2d 408 (Ct.App.1987). As such, they are not favored, and they should be made conforming as soon as reasonably possible. *See id.* While a property owner has a constitutionally protected right to continue the use following enactment of a zoning ordinance, provisions terminating the nonconforming use upon destruction of a specified portion of the premises, or upon failure to begin reconstruction within a specified time thereafter are proper, so long as the maximum amount of destruction permitted and the time allowed is reasonable. *See, e.g., Byrd v. City of N. Augusta,* 261 S.C. 591, 201 S.E.2d 744 (1974) (Zoning power must be exercised reasonably and not arbitrarily).

In this instance, the City relies upon an ordinance which terminates the nonconforming use after the property owner allows the sign to remain vacant for three months. In *Maguire v. City of Charleston*, 271 S.C. 451, 247 S.E.2d 817 (1978), a nonconforming use was terminated after it was discontinued for one year as required by the ordinance. The Supreme Court refused to allow the land owner to convert the property back to the nonconforming use.

The Master erred in finding the ordinance violated Gay Dolphin's vested right to continue the nonconforming use of the rooftop sign. The ordinance was not applied retroactively to the act of erecting the sign in the 1970's. Nor are any vested rights which Gay Dolphin acquired prior to the enactment of the ordinance being deprived. An abandonment procedure is a valid method for a municipality to effectively and fairly terminate a nonconforming use.

## II. Intent to Abandon

The City next maintains the Master erred in requiring proof of intent to abandon under the ordinance. Instead, it avers the objective time limitation in the ordinance indicates no intent to abandon is required under the ordinance. We agree.

In *Conway v. City of Greenville*, 254 S.C. 96, 173 S.E.2d 648 (1970), the Supreme Court said:

In order to constitute abandonment, it must appear that there was a discontinuance of the nonconforming use with the intent to relinquish the right to so use the property. The question is largely one of intention and must be determined from all the surrounding facts and circumstances.

*Id.* at 105, 173 S.E.2d at 653 (citations omitted).

The City claims *Conway* is distinguishable from this case because it discussed common law abandonment. The City relies on *Gurganious v. City of Beaufort,* 317 S.C. 481, 454 S.E.2d 912 (Ct.App.1995) interpreting statutory abandonment.

In *Gurganious,* a property owner had a nonconforming fence which was destroyed by fire. More than one year later, the property owner attempted to replace the fence. The city ordinance provided for a one year time limit on the resumption of usage or reconstruction of a partially destroyed nonconforming structure. The property owner claimed his nonconforming fence was grandfathered.

Finally, Gurganious claims the [review board] erred by finding the fence was not "grandfathered" under City Code § 5–6108, without regard to the issue of intent to abandon the nonconforming fence. The City of Beaufort Code § 5–6108 has an objective time limitation on the resumption of usage or reconstruction of a partially destroyed nonconforming structure. The failure to rebuild following destruction within the time required within the ordinance is fatal to any claim of grandfathered status. Gurganious argues the [review board] should have applied the common law definition of abandonment as enunciated in *Conway v. City of Greenville,* 254 S.C. 96, 173 S.E.2d 648 (1970), rather than the statutory definition in § 5–6108(2) of the Code of Laws for the City of Beaufort. We find no error.

In *Conway,* the Supreme Court defined abandonment of a nonconforming use as "a discontinuance of the nonconforming use with the intent to relinquish the right to so use the property." *Id.* at 105, 173 S.E.2d at 653. However, the facts of *Conway* are distinguishable from this case because the court did not have before it, nor did it address any municipal zoning ordinance providing for a specific time period in which to resume a nonconforming use....

While a property owner has a constitutionally protected right to continue the use following enactment of a zoning ordinance, provisions terminating the nonconforming use upon destruction of a specified portion of the premises, or upon failure to begin reconstruction within a specified time thereafter are proper, so long as the maximum amount of destruction permitted and the time allowed is reasonable.

*Id.* at 488–90, 454 S.E.2d at 916–18.

Gay Dolphin asks this Court to adopt the reasoning of the dissent in *Maguire, supra.* Maguire purchased a house which was at the time the residence of a mentally incompetent individual. Prior to its use as a residence, the house was the medical office of the individual's father. The city enacted zoning restrictions allowing for only residential uses of the property. The zoning law had an objective time frame for abandonment, and like Myrtle Beach's ordinance required no intent to abandon.

Maguire argued he should be allowed to return the property to its nonconforming use as a doctor's office due to the mental incompetency of the resident. The son would not be able to form the required intent to abandon the nonconforming use of the property, and, therefore, it should still be capable of use as a doctor's office. The Supreme Court held: "We conclude that Dr. Maguire, who purchased the property five years after the area was restricted to residential use, should not be allowed to reap the benefits of the prior occupant's incompetency. Dr. Maguire's Estate may not circumvent municipal zoning law by asserting [the son's] disability."

In his dissent, Justice Rhodes asserts an interpretation of the objective abandonment provision, such as the one adopted by North Dakota in *City of Minot v. Fisher,* 212 N.W.2d 837 (N.D.1973), is appropriate. Justice Rhodes adopted the reasoning of the *Minot* Court:

Under the . . . interpretation, which was adopted by the court in *Minot,* upon expiration of the discontinuance time period, a presumption arises that the property owner intended to relinquish the nonconforming use; however, the presumption does not apply if the cessation or non-exercise of the nonconforming use is due to circumstances beyond the control of the property owner. . . .

. . . .

... Further, I feel that this view more nearly accords with our prior decision in the case of *Conway v. City of Greenville*, 254 S.C. 96, 173 S.E.2d 648 (1970). Although *Conway* involved the issue of intent to abandon and did not involve the type of zoning ordinance under review in the present action, we held in that case that a nonconforming use was not extinguished when the cessation of such use was due to reasons beyond the control of the property owner.

This view was not adopted by the majority of the Justices on the Supreme Court. The majority did not require the ability to form an intent, and therefore, did not require an intent to abandon under an objective statutory abandonment provision.

■■■ Under *Gurganious* and *Maguire*, intent to abandon is not required where the ordinance provides an objective time frame. Myrtle Beach Code § 902.4.7 provides a sign shall not be deemed abandoned until a three-month time period has passed. The ordinance, therefore, provides an objective time frame. Intent to abandon is not required, and the Master erred in requiring its proof.

### III. Specific Abandonment Period

■■■ The City asserts the Master erred by apparently requiring proof of a particular 90 day period of abandonment although no one disputed the absence of a sign facing for five years. The Master found that the City "produced no competent evidence of a specific 90–day abandonment period."

Savageau testified the 90 day period would been to run "[w]hen they took the sign down." Further, he said: "[W]e noticed that after a period of time, which was a, a good month, nothing was happening. From that point out, I started counting ninety days." This testimony with the admission the sign displayed *nothing* for five years is certainly sufficient evidence to demonstrate an abandonment for 90 days.

### IV. Permit Requirement

The Master determined a permit was not required to replace the sign. The order states:

[Gay Dolphin], however, did not need a permit to replace their sign. [City] testified that normal sign maintenance does not require a permit, and sign faces may be changed as often as desired. Because [Gay Dolphin] was never notified its sign had been deemed abandoned, It did not lose the ability to replace the sign facing at will, as every other sign, grandfathered or not, is allowed to do.

The City maintains: 1) a permit is required; 2) normal maintenance and the ability to change sign facing must be within a reasonable time of removal; and 3) no notice was required by the City before the sign is deemed abandoned. We agree.

The ordinance reads:

902.5.1 Sign permits required. Unless otherwise provided for in this ordinance, no sign or sign structure, regardless of its cost of construction, shall be erected, replaced, relocated, constructed, changed or altered until after a permit for the same has been issued by the building inspector.

902.5.2 Signs exempt from permit procedures. A permit is not required for the following types of signs or sign alterations ...

a. Changing copy on a legal bulletin board, outdoor advertising sign, or marquee; or maintenance where no structural changes are made; or the changing of the interchangeable letters on signs designed for them; or changing the color of illumination systems.

The City asseverates the ordinance must be read as a whole to derive its intent to eliminate nonconforming signs in an expeditious though fair manner. *See,* Myrtle Beach Code § 902.8.1. "An ordinance must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers." *Restaurant Row Associates v. Horry County,* 327 S.C. 383, 391, 489 S.E.2d 641, 645 (Ct.App.1997), *aff'd as modified,* 335 S.C. 209, 516 S.E.2d 442 (1999). This Court in *City of Camden v. Brassell,* 326 S.C. 556, 560, 486 S.E.2d 492, 494 (Ct.App.1997), edified:

For guidance, we examine the applicable statutes with circumspection giving due deference to the legislative will.

Predominantly, the Court analyzes the statutory language so as to glean the legislative intent.

. . . .

The cardinal rule of statutory construction is to ascertain and effectuate the legislative intent whenever possible. *Joint Legislative Comm. v. Huff, et al.,* 320 S.C. 241, 464 S.E.2d 324 (1995). *See also Glover by Cauthen v. Suitt Constr. Co.,* 318 S.C. 465, 458 S.E.2d 535 (1995) (primary rule of statutory construction requires that legislative intent prevail if it can reasonably be discovered in language used construed in light of intended purpose). All rules of statutory construction are subservient to the one that legislative intent must prevail if it reasonably can be discovered in the language used, and that language must be construed in the light of the intended purpose of the statute. *Kiriakides v. United Artists Communications, Inc.,* 312 S.C. 271, 440 S.E.2d 364 (1994). The determination of legislative intent is a matter of law. *Charleston County Parks & Recreation Comm'n v. Somers,* 319 S.C. 65, 459 S.E.2d 841 (1995).

*Id.,* 326 S.C. at 560, 486 S.E.2d at 494.

The ordinance contains an abandonment provision to eliminate signs which remain vacant for three months:

902.4.7 Obsolete and abandoned signs

a. Any sign which advertises or pertains to a business, product, service, event, activity or purpose which is no longer conducted or that has not been in use for *three months* or which is no longer imminent, or any sign structure that no longer displays any sign copy shall be deemed to be an obsolete or abandoned sign. (Emphasis added)

## A. Changing Sign Copy

■■■ It is impossible to reconcile the Master's holding that a sign face can be replaced at will, even after a five-year vacancy, with the provision for abandonment. The intent of the City was to allow for routine changing of the message of the sign. This is a task that should be completed within a reasonable time, and obviously is capable of completion within three months. Edward Fanjoy testified that he was in the outdoor billboard business. He explained that the panels

could be taken off in "probably thirty or forty minutes" and replaced in "just a fraction of time longer."

The intent of the City in passing the ordinance was to allow changing of the sign copy. However, under the Master's interpretation that the sign facing can be changed "at will," a vacant sign could never be deemed abandoned by the city. The owner could always claim he was in the process of changing the sign facing. This leads to an irreconcilable and absurd result. For the Master to state that no permit was required to change the sign face after five years was apodictically error.

## B. Normal Maintenance

 The Master also determined the sign replacement would be allowed under normal maintenance. Once again, this cannot be reconciled with the abandonment section. In addition, normal sign maintenance would imply routine maintenance to keep the sign operational. Leaving a sign vacant for five years, even if the original purpose of removal was to avoid damage by a hurricane, appears to be more than normal maintenance. Allowing a five-year time frame for replacement once again leads to an absurd result when juxtaposed with the three-month abandonment section.

## C. Notice

 The Master found notice must be given to Gay Dolphin by the City before a permit is required. The City asserts no notice is required under the ordinance. Abandonment is an act within the control of the sign owner and required no action by the City. We agree with the City.

The ordinance does not require affirmative action by the City or notice before a sign is abandoned. It mandates any sign which displays an out-of-date message, or is vacant for three months is deemed abandoned. The requirement of notice does not appear in the ordinance.

Myrtle Beach Code § 902.4.7(c) dictates:

Obsolete or abandoned signs, sign copy or sign structures are prohibited and shall be removed by the owner of the property, his agent, or person having the beneficial use of the building or site upon which sign or sign structure is

erected within 30 days after written notification from the building inspector.... In the event of noncompliance with the aforesaid terms and provisions, the city shall remove such signs at the expense of the property owner.

The section does require notice be given before the City may remove a sign that has been deemed abandoned. Nevertheless, the sign is assumed to already be deemed abandoned at the time the notice is required. Gay Dolphin would not be required to take the sign down until notice is provided, although the sign could be deemed abandoned after three months of vacancy and without notice.

The father served on the zoning board and the son was a member of the Community Appearance Board. Both should have been aware of the ordinance in question. The father's and son's "mistaken view of the law is of no avail to him. *Ignorantia juris quod quisque tenetur scire, neminem excusat.*[11]" *Oxford Finance Companies, Inc. v. Burgess,* 303 S.C. 534, 539, 402 S.E.2d 480, 482 (1991).

Gay Dolphin was required to apply for and obtain a permit prior to replacing the sign facing. The lack of written notice by the City did not excuse the five-year vacancy of the sign structure from becoming abandoned. Normal maintenance and changing of the sign copy must both be done in a reasonable time, not to exceed the three-month provision for abandonment.

### V. Estoppel

Gay Dolphin avers the City should be estopped from claiming Gay Dolphin abandoned the sign. We disagree.

The essential elements of equitable estoppel are (1) lack, on the part of the one claiming estoppel, of the knowledge and means of knowledge of the truth as to the facts and circumstances upon which his claim of estoppel is predicated; (2) conduct, representations, or silence of the party estopped, amounting to misrepresentation or concealment of facts; (3) reliance upon such conduct, representations, or silence; and (4) resulting action, to its detriment, by the party claiming the estoppel.

---

11. Ignorance of the [or a] law, which everyone is bound to know, excuses no man. BLACK'S LAW DICTIONARY 673 (5th ed. 1979).

*Berkeley Elec. Co-op., Inc. v. Town of Mount Pleasant,* 308 S.C. 205, 210, 417 S.E.2d 579, 582 (1992) citing *Lewis v. City of North Myrtle Beach,* 297 S.C. 170, 375 S.E.2d 327 (Ct.App. 1988). *See also LaRosa v. Johnston,* 328 S.C. 293, 493 S.E.2d 100 (Ct.App.1997). Estoppel is an affirmative defense and the burden of proof is upon the party who asserts it. *Frady v. Smith,* 247 S.C. 353, 147 S.E.2d 412 (1966).

## A. Hurricane Damage

 Gay Dolphin argues the City should be estopped because the City informed Gay Dolphin that the sign could not be replaced after Hurricane Hugo based on the extent of damage to the sign. Although the City apparently sent a letter informing Gay Dolphin it could not replace the sign after Hugo based on the degree of damage, Gay Dolphin knew the assessment was incorrect. The father testified the sign sustained "maybe 10 percent" damage. The son testified "three sign companies [were] willing to say that it was only 10 percent [damaged]." Gay Dolphin, thus, had actual knowledge that the City's damage assessment was incorrect. Accordingly, Gay Dolphin may not assert estoppel against the City based on the damage assessment.

## B. Agreement with City Official

 Gay Dolphin next asserts the City should be estopped because Gay Dolphin and Leath agreed to replace the sign with a unipole sign. Gay Dolphin, however, failed to pursue the unipole option. Further, Gay Dolphin did not rely on this agreement. Although the father "didn't want to rock the boat and ... I believed ... Leath ... was going to give us what we wanted," the son understood Leath "was going to get back to us and give us an answer on it, on, on, on that situation and *if he didn't our alternative was, we were going to put the sign back up.*" (emphasis added). The father "had no intentions of taking the sign down until we got just compensation for it." Gay Dolphin could have inquired into the status of the unipole option. Its failure to do so does not amount to a misrepresentation or concealment by the City.

## C. Delay in Enforcement

██ In *Flowers v. South Carolina Dep't. of Highways and Public Transp.*, 309 S.C. 76, 79–80, 419 S.E.2d 832, 834 (Ct.App.1992), in a strikingly similar situation, this Court found a sixteen year delay in enforcing a sign ordinance did not estop the Department from requiring the sign's removal.

In a letter dated June 7, 1974, the Department notified Stuckey's that its sign was an illegal, nonconforming sign and that the Department would take "necessary action to remove it as an illegal sign" if Stuckey's did not remove it within 60 days following receipt of the letter. The Department waited until February 9, 1989, to take the necessary action.

The mere delay by the Department in requiring the sign's removal, however, does not work an estoppel against the Department's enforcement of the Highway Advertising Control Act. *See State v. Chavis*, 261 S.C. 408, 200 S.E.2d 390 (1973) (the State held not estopped to suspend the driver's license of a defendant convicted of driving under the influence because of a one-year delay in suspending his license); *Doris v. Police Commissioner of Boston*, 374 Mass. 443, 373 N.E.2d 944 (1978) (inattention or inactivity of government officials does not render a statute unenforceable so as to deprive the public of the benefits and protections afforded by the legislature); *cf. Outdoor Advertising Board v. Sun Oil Company of Pennsylvania*, 8 Mass.App.Ct. 872, 391 N.E.2d 916 (1979) (the Outdoor Advertising Board held not estopped to commence an action to remove a sign where six years earlier the board indicated the sign was lawful and fell under another's jurisdiction). Indeed, Stuckey's and Fennell have benefitted by the long delay in that the sign, which the Department deemed an illegal, nonconforming sign, has provided Stuckey's with advertising and Fennell with income that each, as it turned out, would not have had if the Department had acted more quickly to enforce the statute.

*Flowers v. South Carolina Dep't of Highways and Public Transp.*, 309 S.C. 76, 79–80, 419 S.E.2d 832, 834 (Ct.App.1992). The Master properly determined the City is not estopped from asserting its ordinances.

## VI. Just Compensation

 The City challenges the Master's finding that it must pay compensation to Gay Dolphin under a former code section. The Master held the "abandonment cause of action arose in late 1989, and [the City] must pay just compensation for its removal." The former section provided:

> Notwithstanding any other provision of law, in no case shall the State or any county, municipality, local zoning authority, or other political subdivision *remove, or cause to be removed,* any sign located in view of an interstate or federal-aid primary highway and lawfully erected under the laws of the State of South Carolina without paying just compensation.

S.C.Code Ann. § 57–25–195 (Supp.1980) (emphasis added).

That version became effective June 23, 1980. However, as enunciated in *U.S. Outdoor Advertising, Inc. v. South Carolina Dep't of Transp.*, 324 S.C. 1, 481 S.E.2d 112 (1997):

> The Highway Beautification Act of 1965, 23 U.S.C. § 131 requires the various states to provide for control of outdoor advertising along federal highways, subject to a withdrawal of federal funding for non-compliance. In response to 23 U.S.C. § 131, the South Carolina General Assembly enacted the "Highway Advertising Control Act" (Act), S.C.Code Ann. § 57–25–110 *et seq.* (1991). The purpose of the Act, in part, is to prevent distraction of operators of motor vehicles, promote the safety, convenience, and enjoyment of travel on highways within this State, and preserve and enhance the natural scenic beauty and aesthetic features of highways and adjacent areas. S.C.Code Ann. § 57–25–130 (1991).

> Section 57–25–195 was amended to read:

> In order to comply with Section 131, Title 23, United States Code and regulations promulgated under that section and to prevent interruption of the state's federally-aided highway funding, the Department of Transportation shall confer with the Federal Highway Administration as to how best to structure a nonconforming sign removal program.

> The department shall submit to the Federal Highway Administration in a timely fashion its process, program, and timetable for removal of nonconforming signs under Section

131, Title 23, United States Code and regulations promulgated under that section.

In developing and implementing this removal program the department shall consult with interested parties and affected entities including, but not limited to, other state and local agencies, sign owners, environmental groups, and the business community.

S.C.Code Ann. § 57–25–195 (Supp.1998).

Under the statutes in effect in 1994, compensation for the removal of signs was governed by S.C.Code Ann. § 57–25–190 (Supp.1998).

§ 57–25–190. Compensation for removal of signs.

(A) The Department of Transportation may acquire by purchase, gift, or condemnation and shall pay just compensation upon the *removal* of the following outdoor advertising signs:

(1) those lawfully in existence on November 3, 1971;

(2) those lawfully erected after November 2, 1971.

(B) Compensation may be paid only for the taking from the owner of:

(1) a sign of all right, title, leasehold, and interest in it;

(2) the real property on which the sign is located of the right to erect and maintain a sign on it.

(C) No sign may be removed until the owner of the property on which it is located has been compensated fully for a loss which may be suffered by him as a result of the removal of the sign through the termination of a lease or other financial arrangement with the owner of the sign. The compensation must include damage to the landowner's property occasioned by the removal of the sign. The Department of Transportation is limited to an expenditure of five million dollars for the state's part of just compensation.

(D) Tourist oriented directional signs must be the last to be removed under the terms of this article.

S.C.Code Ann. § 57–25–190 (Supp.1998) (emphasis added).

The Master reasoned:

[W]hether the sign was nonconforming under [the City's] ordinance is irrelevant; the only relevant questions are whether the sign was lawfully erected under State law and

in view of a federal-aid primary highway.... [The City] attempts to argue that the law in 1994 controls because that is when [Gay Dolphin] replaced the sign facing on their sign, and that is when [the City] attempted to keep [Gay Dolphin] from replacing the sign facing. When [Gay Dolphin] replaced the sign facing, however, is irrelevant to the issue of when [the City's] cause of action for abandonment arose. [The City] steadfastly claim[s] that [Gay Dolphin's] sign was abandoned at some point in time shortly after Hugo. The law in effect at that time clearly stated that [Gay Dolphin's] sign could not be removed without just compensation being paid.

Compensation under the former code section is required when the zoning authority *"remove[s], or cause[s] to be removed"* a lawfully erected sign in view of a federal-aid primary highway. S.C.Code Ann. § 57-25-195 (Supp.1980) (emphasis added). The sign, however, was not removed by the City in 1989, but was removed by Gay Dolphin. The City did nothing in 1989 to prevent Gay Dolphin from replacing the sign. From September of 1989 until 1994, no sign, as defined in S.C.Code Ann. § 57-25-120(3), existed on the Ed's Hobby Shop rooftop.

"Sign" or "outdoor advertising sign" means an outdoor sign, display, device, figure, painting, drawing, message, plaque, poster, billboard, or other thing which is designed, intended, or used to advertise or inform, or any part of the advertising or its informative contents.

The first action by the City occurred in 1994, when Gay Dolphin attempted to replace the sign. The City sought to *remove* the sign in question in 1994, after Gay Dolphin had voluntarily removed it five years prior. We conclude the sign in the instant case was abandoned. Concomitantly, the City is *not* required to pay just compensation to Gay Dolphin.

██ Further, under S.C.Code Ann. § 57-25-190, just compensation is required for removal of signs "lawfully erected" after November 2, 1971, or "lawfully in existence" prior to November 3, 1971. Under the regulations in effect in 1994: "If a permitted sign is voluntarily removed or dismantled for a period of more than 30 days, the permit *will be voided.*" 25A S.C.Code Ann.Regs. 63-349(R) (Supp.1998) (emphasis added). In this case, the sign was removed from the effective date of

this regulation, June 24, 1994, until Gay Dolphin attempted to replace its sign in October of 1994, or more than 30 days. The permit for the sign would be void, and the sign could not be replaced. The City is not seeking the removal of a "lawfully erected" sign, but opposing the replacement of one which was abandoned. The City is therefore not obligated to pay just compensation.

## CONCLUSION

We hold Gay Dolphin's rooftop sign may be deemed abandoned under the provisions of Myrtle Beach Code § 902.4.7. Gay Dolphin was not deprived of any vested rights. We conclude no intent to abandon is required when the ordinance provides for an objective time frame. We rule Gay Dolphin was required to obtain the requisite permits prior to replacing the sign facing and the City was not required to provide notice of the sign's deemed abandonment. The City is not estopped from enforcing its zoning laws. We decide just compensation was not required since the sign was abandoned by Gay Dolphin.

**AFFIRMED IN PART AND REVERSED IN PART.**

GOOLSBY and CONNOR, JJ., concur.