HARBOUR TOWN ASSOCIATES, LTD. Chrisken Real Estate Management Company, Inc. and The Indiana National Bank, as Trustee, Appellants (Defendants Below),

v.

CITY OF NOBLESVILLE, Appellee (Plaintiff Below).

No. 29A04–8804–CV–135.

Court of Appeals of Indiana, Fourth District.

July 20, 1989.

Phillip R. Scaletta, David H. Eyke, Ice Miller Donadio & Ryan, Indianapolis, for appellants.

Douglas D. Church, Church Church Hittle & Antrim, Noblesville, for appellee.

CHEZEM, Judge.

### Case Summary

Harbour Town Associates, Ltd., Chrisken Real Estate Management Company, Inc., and The Indiana National Bank, appeal the

granting of the City of Noblesville's Motion for Permanent Injunction. We affirm.

## Issues

(1) Whether the trial court abused its discretion by ruling that the owners of an Apartment complex located in a residential zoning district violated the City of Noblesville's ("the City") zoning ordinance by leasing boat docks and a boat ramp at the Apartment complex to members of the general public not residing at the Apartment complex.

(2) Whether the trial court abused its discretion by ruling that the City was not prohibited by the doctrine of laches from enforcing its zoning ordinance.

## Facts

On April 21, 1987, the City filed its Motion for Temporary Restraining Order and Complaint for Mandatory Injunction to enjoin Harbour Town Associates, Ltd. (the beneficial owner), Chrisken Real Estate Management Company, Inc. (managing agent of the Apartment complex), and The Indiana National Bank (as Trustee), (all appellants will be referred to collectively as "Harbour Town"), from leasing the boat docks and boat ramp located at the Apartment complex to non-residents in violation of the City's zoning ordinance.

The Apartments were developed in two phases, and zoning approval was sought and obtained from the City prior to the construction of each phase. The Apartments were constructed on property classified as a "C" Residence District by the Zoning Code of Noblesville ("Zoning Code"). The Apartments were classified more specifically as a conditional use, garden apartment, while the boat docks and ramp were permitted as "accessory uses" to the apartments under the "C" Residence District classification.

A number of the boat docks were leased to the general public since the construction was completed in 1974. After purchasing the Apartments in 1985, Harbour Town continued the practice of leasing the docks to residents and non-residents alike. Thus, the use of the boat docks by the general public has continued uninterrupted since 1974. In late 1986, after the City was notified, via a citizen complaint, of the zoning violation, the City sent a letter to Harbour Town advising them that Harbour Town's practice of leasing boat docks to the public was a violation of the Zoning Code.

On March 21, 1988, the trial court issued a permanent injunction enjoining Harbour Town from leasing the boat docks and ramp to non-residents. The trial court determined that the leasing activity was a commercial use unrelated to the Apartments' principal use, and thus violative of the City's Zoning Code. The trial court also ruled that the City's enforcement of the Zoning Code against Harbour Town was not barred by the equitable doctrine of laches.

## Discussion

### (1)

▉ The standard of review in actions to enjoin zoning violations is to determine whether the trial court abused its discretion in granting the injunction. *Metropolitan Development Commission v. Hair* (1987), Ind.App., 505 N.E.2d 116, 117. "An abuse of discretion will be found only if the trial court's decision is clearly against logic, and the trial court's findings of fact will be disturbed only if they are clearly erroneous." *Id.* *See also*, Indiana Rules of Procedure, Trial Rule 52(A).

▉ "An allegation and proof of a valid ordinance and evidence establishing a violation of that ordinance will sustain a suit for injunction against a land owner." *Board of Zoning Appeals, Etc. v. Freeman* (1982), Ind.App., 437 N.E.2d 1035, *citing Spurling v. Area Plan Commission of Evansville* (1978), Ind.App., 381 N.E.2d 507; *DeSchamps v. Board of Zoning Appeals of Kokomo* (1961), 241 Ind. 615, 174 N.E.2d 581, 583. Here, there is no dispute that the Apartments are located on property validly zoned as "C" Residence District.

▉ Harbour Town argues that apartments, in general, are "designed to be a commercial success and generate a return on the owner's investment; [therefore,] the principal use of this property is commer-

cial. [Further], because of the unique location of the development, ... the commercial leasing to non-residents is a proper accessory use to the commercial principal use of the property." However, we have held that "ownership is not determinative of use." *Maxey v. Board of Zoning Appeals* (1985), Ind.App., 480 N.E.2d 589, 593. "The term 'use,' as employed in the context of zoning, is a word of art denoting 'the purpose for which the building is designed, arranged or intended, or for which it is occupied or maintained.' Both zoning in general and 'uses' in particular focus on how a building or parcel of land is utilized ...." *Pleasureland Museum v. Dailey* (1981), Ind.App., 422 N.E.2d 754, 755 (citations omitted). *See also, Hair supra.*

Section 61.17 of the Zoning Code of Noblesville sets forth the intended uses for real estate classified as a "C" Residence District:

> This District is intended primarily to provide for a wide range of dwelling types including single, two and multi-family dwellings; and Garden Apartment Uses and Mobile Home Parks as Conditional Uses. This District is designed for areas having approved public water supply and sanitary sewer systems.
>
> (a) PERMITTED USES
> (1) Single–Family Dwelling
> (2) Two–Family Dwelling
> (3) Multi–Family Dwelling
> (4) Conditional Uses, as set forth in Sec. 61.43, Uses 2, 3, 7–9, 11–13, 17–19, 21, 24–26, 30 and 31.
> (5) Contingent Uses, as set forth in Sec. 61.42, Uses 1–9, and 11.
> (6) Mobile Home, in a Mobile Home Park in accordance with Sec. 61.34.
> (7) Garden Apartment Use (which is a Conditional Use), as set forth in Sec. 61.40.
> (8) Accessory Uses, as set forth in Sec. 61.44.
> (9) Temporary Uses, as set forth in Sec. 61.45.
> (10) Home Occupations, as set forth in Sec. 61.46.

A "C" District allows for both Conditional Uses ("those uses traditionally affected with a public interest and those uses entirely private in character but of such an unusual nature that their operation may give rise to unique problems with respect to their impact upon neighboring property and public facilities." Sec. 61.43) and Contingent Uses ("one which is likely or liable, but not certain, to occur and which is not inappropriate to the principal Uses of the District in which it may be located." Sec. 61.42).

■ The party seeking permission for a Conditional Use (there are no provisions explaining the procedure to obtain a Contingent Use) must file an application with the Board. The original owner of the Apartments sought approval for development of the property and received permission to construct Garden Apartments, as a conditional use. Section 61.62 of the Code defines "Garden Apartment Use" as:

> An architectural and functional grouping of Dwelling units which may include Townhouses in one or more buildings not exceeding two and one-half (2½) stories in height with at least two (2) but not more than twenty (20) dwelling units in each building or buildings, and appropriate associated and accessory uses, which is the central feature of a development plan composed of building area, parking area, landscape development and planting areas, and other land features appropriate for its use as dwellings, and which conforms to the standards and requirements of this Code; provided, that each Garden Apartment Use shall have at least twelve (12) dwelling units.

This Section clearly shows that the principal use of garden apartments is residential, and that the appropriateness of other features on the land is to be judged with reference to the use of the property as a dwelling place. The trial court did not abuse its discretion in finding that the principal use of the Apartments is residential.

■ The trial court also ruled that leasing the docks to non-residents constituted a commercial use and thus was not a permissible accessory use of the property. Section 61.62 of the Code defines an accessory building and use as "[a] Building or Use

subordinate to another Structure or Use located on the same Lot and which does not change or alter the character of the premises ..." Accessory Uses are also set forth in Section 61.44 of the Code:

(a) INTENT

Accessory Uses shall be permitted in all zone districts in accordance with the provisions of this section. Accessory Uses: (1) Shall be incidental and subordinate to, and commonly associated with the operation of the principal use of the lot. (2) Shall be operated and maintained under the same ownership and on the same lot as the principal use. (3) Shall be clearly subordinate in height, area, bulk, extent and purpose to the principal use served. (4) Shall not be located closer to any lot line than the minimum setback line required, unless specified otherwise in this Code. (5) Shall not be permitted prior to the erection and operation of the principal use, unless a temporary Improvement Location Permit is obtained in accordance with Sec. 61.45.

Clearly, only uses of property that are subordinate and incidental to the principal use of the property are permitted. Here, the leasing of the boat docks to non-residents was not permitted under the zoning classification, nor was it subordinate to the property's principal residential use. Therefore, it was not an accessory use of the property, and similarly did not qualify as an allowable use.

The decision of this court in *Maxey v. Board of Zoning Appeals, supra,* further illustrates the concept of an accessory use. In *Maxey,* two individuals purchased property which had been used by Valparaiso Community schools as a bus maintenance and storage facility. The purchasers intended to use the facility in much the same way but as a private, commercial enterprise. The maintenance facility, per se,

was not allowed under the zoning district; however, because school and public uses were permitted, the facility was permitted as an accessory school use (i.e., incidental thereto). It was solely the character of the main use of the property as school or public which qualified the accessory use as a permitted use. When the new owner tried to separate the main use and the accessory use, this court held the accessory use was no longer permissible. *Id.* at 593. Here, the character and acceptability of the accessory use changes when the docks are leased to non-residents. It becomes a use which would not be permitted as a new use within the district.

In sum, the trial court did not abuse its discretion in finding that Harbour Town violated the Zoning Code.

(2)

■ Harbour Town next argues that the equitable doctrine of laches precludes the City from asserting that Harbour Town's practice of leasing the docks to non-residents violates the Zoning Code. The Indiana Supreme Court defined laches in *Perry v. State* (1987), Ind. 512 N.E.2d 841, 842, as:

[t]he neglect for an unreasonable or unexplained length of time, under circumstances permitting diligence, to do what in law should have been done. It is an implied waiver arising from knowledge of existing conditions and an acquiescence in them, the neglect to assert a right, as taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to the adverse party and thus operating as a bar in a court of equity.

The City argues that laches never applies to a municipality in the enforcement of its zoning regulations. We agree.

Most jurisdictions hold that laches is never applicable to a municipality in enforcing its ordinances.[1] In *Jackson v. Kenai Peninsula Borough* (1987), Alaska, 733 P.2d 1038, the supreme court of Alaska recog-

---

1. *Waller v. Sanchez* (1981), Tex.Civ.App., 618 S.W.2d 407 (As a matter of public policy, defense of laches could not be asserted to bar city's enforcement of zoning ordinance); *Bianco v. Town of Darien* (1969), 157 Conn. 548, 254

A.2d 898 (Although property owners contended the town abandoned enforcement of its zoning ordinance in connection with the use of their property for the storage of garbage trucks, the court held that thirty-three years of official fail-

nized that the reasons behind exempting municipalities from being equitably estopped when seeking to enforce zoning ordinances were equally applicable to laches:

> (1) the defendant seeking to invoke estoppel is under at least constructive notice of the zoning ordinance he seeks to avoid; (2) the purpose of zoning is to protect the public interest and zoning regulations are drawn by representation of the public will pursuant to the political process; (3) a particular officer or individual city representative lacks authority to waive the public's right to enforce its ordinance.

*Id.* at 1041.

> Furthermore, because under laches the only fault of a local government is its inaction, additional policy considerations operate to deny its effect. A city's inactivity is not necessarily wrong; it may be the result of a reasonable decision to use limited enforcement resources for other matters. Indeed, a zoning board cannot police every possible violation. The remedy of non-enforcement of a law is a drastic one for such "fault." Furthermore, the only "reliance" which a landowner can show under a laches theory is that he or she relied upon non-enforcement of a law.

*Id.* at 1043 (citations omitted).

Similarly, in *Shaker Boulevard Co. v. City of Cleveland* (1982), 31 Ohio App.2d 199, 287 N.E.2d 814, the court held that equitable principles do not outweigh the public policy interests inherent in the enforcement powers of a zoning board:

> It may be argued that "equity" requires a balancing of hardship after the fact of long violation. If there is equity in prolonged violation, it has only a specious quality. The wrongdoer brought his condition on himself. And such balancing as the equity argument requires would surely encourage violations by holding out the propsect of an equitable cure for deliberate but long undiscovered transgressions. No zoning policy would survive the impact of so pernicious a doctrine once it was approved by the courts.

287 N.E.2d at 821–22. We agree with the reasoning of these courts that public policy interests prohibit a private party from asserting laches against a municipality in the enforcement of its zoning ordinances.

While Indiana courts previously have not expressly considered whether municipalities may be barred by laches from enjoining a zoning violation,[2] Indiana courts have considered whether governmental entities can be barred by the similar defense of equitable estoppel. The difference between equitable estoppel and laches is that a party alleging equitable estoppel claims that he acted in reliance upon some affirm-

---

ure to enforce the ordinance did not preclude enforcement at a later date. A zoning commission is not estopped by laches from enforcing its zoning laws); *Corvallis Sand & Gravel Co. v. State Land Board* (1968), 250 Or. 319, 439 P.2d 575 (Laches defense not available against state, which sought to eject property holders over twenty-five years after learning of their claim of private ownership of property; *City of Beatrice v. Williams* (1961), 172 Neb. 889, 112 N.W.2d 16) (It is enough to say that the doctrine of laches has no application to the enforcement by a municipality of its ordinances); *Universal Holding Co. v. Township of North Bergen* (1959), 55 N.J.Super. 103, 150 A.2d 44 (A city not barred by laches from obtaining an injunction against a business enterprise located in a residential zone even though businesses had operated in the building for over twenty-five years. The application of laches as a defense to a municipality's attempt to enforce its zoning ordinance does not, generally speaking, comport with salutary public policy, and the doctrine should not be permitted to frustrate the enforcement of a valid zoning regulation except in the clearest and most compelling circumstances); *City of Yonkers v. Rentways* (1952), 304 N.Y. 499, 109 N.E.2d 597 (In affirming an injunction for a zoning violation that had existed for over twenty years, the court stated, "A municipality, it is settled, is not estopped from enforcing its zoning laws wither by the issuance of a building permit or by laches.")

**2.** In *Taylor v. Metropolitan Development Commission* (1982), Ind.App., 436 N.E.2d 1157, the Court of Appeals did not hold that the equitable doctrine of laches could operate to bar a municipality, which had constructive knowledge of a zoning violation, from enforcing its zoning ordinances. The Court simply held that *assuming* laches applied in such a case, the trial court in that case did not abuse its discretion in deciding that the defendant failed to prove all the elements of laches. (emphasis supplied)

ative action taken by the municipality, while a party asserting laches claims that he was prejudiced by the municipality's inaction.

Judge Young, in writing for the Fourth District, discussed the doctrine of laches in *Board of Zoning Appeals v. Beta Tau Housing* (1986), Ind.App., 499 N.E.2d 780. Upon closer examination, however, the doctrine of equitable estoppel was applied.

In *Beta Tau,* the Beta Tau Housing Corporation had operated a fraternity house in a residential zoning district, which would permit a boarding house use upon application and approval as a special exception. Beta Tau never made the required application. However, it applied for a parking variance in 1971 and sought information about a rear yard setback variance in 1973. The board was aware of Beta Tau's intent to use the property as a fraternity house when the fraternity applied for the variance; the application clearly stated the name of the fraternity. In 1974, Beta Tau decided to remodel its house and contacted the zoning administrator who advised that a building permit would not be needed; the remodeling was completed at a cost of approximately $15,000. In 1980, city zoning officials notified Beta Tau of a zoning violation. In 1983, Beta Tau applied for the special exception. Although the special exception was denied, the board granted Beta Tau a special exemption to operate the fraternity until 1984 when the board would determine whether or not the fraternity's location would be included within the city's new fraternity district. Ultimately, the new district did not encompass the location of the Beta Tau house, and after Beta Tau's special exemption expired, the board filed suit to enjoin Beta Tau's operation in 1985. *Id.* at 782.

A party claiming equitable estoppel must show its "(1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially." *City of Crown Point v. Lake County* (1987), Ind., 510 N.E.2d 684, 687 *citing Damler v. Blaine* (1943), 114 Ind.App. 534, 51 N.E.2d 885. In *Beta Tau,* the board had actual knowledge that Beta Tau operated a fraternity house on the property in 1971 and again in 1974. Further, despite its knowledge, the board did not contact Beta Tau regarding a zoning violation until 1980 and did not file an enforcement action until 1985. In 1983, when Beta Tau applied for the special exception, the city granted Beta Tau a special exemption. The grant expressly authorized Beta Tau to continue its use of the property which the city later asserted was illegal under the Code. Clearly, the city's acquiescence was a positive action and not mere passive inaction. Lastly, Beta Tau was prejudiced given the fact that it expended approximately $15,000 to remodel its property.

■ Here, Harbour Town failed to argue (or cite to authority) that the City should be equitably estopped from asserting the zoning violation. Accordingly, the issue is waived. *Whisman v. Fawcett* (1984), Ind., 470 N.E.2d 73, 80; *Baesler's Super–Valu v. Indiana Commissioner of Labor,* (1986), Ind.App., 500 N.E.2d 243, 249.

For the above reasons, the trial court's granting of a permanent injunction was proper.

MILLER and ROBERTSON, JJ., concur.