552 S.E.2d 42

**Phil HEILKER, d/b/a Mama's Used Furniture and Mama's Discount Furniture Depot, Respondent,**

**v.**

**ZONING BOARD OF APPEALS for the City of Beaufort, Appellant.**

No. 3374.

Court of Appeals of South Carolina.

Heard June 6, 2001

Decided July 23, 2001.

Rehearing Denied Sept. 19, 2001.

402

William B. Harvey, III, of Harvey & Battey, of Beaufort, for appellant.

C. Scott Graber, of Graber & Baldwin, of Beaufort, for respondent.

ANDERSON, Judge:

This appeal involves the application of a local zoning ordinance. The Zoning Board of Appeals for the City of Beaufort ("the Zoning Board") ordered Phil Heilker to cease the outside display of indoor furniture at his retail stores. The Circuit Court reversed, finding Heilker's displays were protected, nonconforming "uses" of his property. We reverse.

## FACTS/PROCEDURAL BACKGROUND

Heilker owns two discount furniture stores in the city of Beaufort. He has operated Mama's Used Furniture for approximately ten years and Mama's Discount Furniture Depot for approximately three years. During these times, Heilker has displayed furniture—mattresses, bunk beds, sofas, chairs, and couches—immediately outside his businesses.

The city of Beaufort adopted Ordinance O–61–99 (the "Ordinance"). The Ordinance amended the language of the city's zoning code relating to the city's "Highway Corridor Overlay Zoning" scheme. The stated purpose for this "Highway Corridor" district is:

> [T]o protect and promote the appearance, character, and economic value of development in the City of Beaufort adjacent to major roads .... [T]o encourage and better articulate positive visual experiences along the City's major roads and to assure respect for the character, integrity, and quality of the built and natural environments of the City .... [T]o enhance the quality of development and to promote traffic and pedestrian safety .... [T]o protect and enhance the City's unique aesthetic character and encourage development which is harmonious with the natural and man-made assets of the Lowcountry.

*Id.* at § 5–6201.

The Ordinance, *inter alia*, created new restrictions on the outdoor display of certain types of merchandise in the "Highway Corridor" district:

> Only merchandise typically used and stored outdoors may be displayed outdoors. Such merchandise shall include automobiles, trucks, boats, trailers, outdoor landscape structures (garden sheds, arbors, gazebos, etc.), plant materials, agricultural products, lawn maintenance equipment, and outdoor furniture.

*Id.* at § 5–6209(f)(1).

Heilker's stores are located within the "Highway Corridor" district. Libby Anderson, the City of Beaufort's Planning Director, informed Heilker by letter that "[a]mong other things, Ordinance O–61–99 bans the outdoor display of merchandise that is not typically used and stored outdoors." Anderson told Heilker that he could only display furniture in compliance with the Ordinance.

Heilker appealed Anderson's order to the Zoning Board. At a subsequent hearing, Heilker claimed his displays were a "nonconforming use" integral in advertising his stores. The City countered, arguing Heilker's display of furniture was merely a "practice" rather than a "use."

By letter, the Zoning Board stated to Heilker that "[b]ased on the evidence and extensive arguments presented [at the hearing], the Board unanimously voted to deny the appeal and uphold the application of Ordinance O–61–99 ...." The Zoning Board determined, *inter alia*, that the "outdoor display of merchandise is a **practice** associated with a land use (in this case retail sales) and *is not a land use in itself* and so is not subject to the nonconforming uses section of the Zoning Ordinance." (emphasis added).

Heilker appealed the Zoning Board's decision to the Circuit Court. In his appeal, Heilker characterized the above-statement as a conclusion of law.

The Circuit Court judge reversed the Zoning Board's decision. The court concluded: "[T]he outdoor display of furniture in front of those two (2) businesses known as Mama's Used Furniture and Mama's Discount Furniture Depot (in the City of Beaufort) is a protected, vested, nonconforming use of these premises." The Zoning Board appeals.

## STANDARD OF REVIEW

Section 6–29–840 defines the scope of review of a zoning board decision by a Circuit Court judge:

At the next term of the circuit court or in chambers, upon ten days' notice to the parties, the presiding judge of the circuit court of the county shall proceed to hear and pass upon the appeal on the certified record of the board proceedings. *The findings of fact by the board of appeals shall be treated in the same manner as a finding of fact by a jury, and the court may not take additional evidence.* In the event the judge determines that the certified record is insufficient for review, the matter may be remanded to the zoning board of appeals for rehearing. *In determining the questions presented by the appeal, the court shall determine only whether the decision of the board is correct as a matter of law.* In the event that the decision of the board is reversed by the circuit court, the board is charged with the costs, and the costs must be paid by the governing authority which established the board of appeals. (emphasis added).

■ In *Vulcan Materials Co. v. Greenville County Bd. of Zoning Appeals,* 342 S.C. 480, 536 S.E.2d 892 (Ct.App.2000),

this Court analyzed § 6–29–840 as it relates to the appellate review of a zoning board decision:

In 1994, the Legislature enacted a new statutory scheme for local planning and zoning entities embodied in Title 6, Chapter 29, which replaced the existing scheme found in portions of Title 6, Chapter 7, and elsewhere. Act No. 355, § 2, 1994 S.C. Acts 4036, amended by Act No. 15, § 1, 1999 S.C. Acts 37. The new scheme imposed a standard of review whereby "[t]he findings of fact by the [zoning] board of appeals shall be treated in the same manner as a finding of fact by a jury...." S.C.Code Ann. § 6–29–840 (Supp. 1999). Local zoning programs could adopt the new standard promulgated by § 6–29–840 any time prior to December 31, 1999, after which time its adoption became mandatory. *See* Act No. 355 ("On or after December 31, 1999, all local planning programs must be in conformity with the provisions of this act. Until December 31, 1999, this act is cumulative and may be implemented at any time."). Section 6–29–840 differs textually from it predecessor, which treated "[t]he findings of fact by the [zoning] board of appeals [as] final and conclusive on ... appeal." S.C.Code Ann. § 6–7–780 (1977) (repealed 1999).

We have repeatedly held that the old statute, § 6–7–780, imposed an "any evidence" standard of review. "The factual findings of the [b]oard (of zoning appeals) must be affirmed ... if they are supported by **any evidence** ...." *Stanton v. Town of Pawleys Island,* 317 S.C. 498, 502, 455 S.E.2d 171, 172 (1995) (emphasis added); *accord Fairfield Ocean Ridge, Inc. v. Town of Edisto Beach,* 294 S.C. 475, 366 S.E.2d 15 (Ct.App.1988); *Bailey v. Rutledge,* 291 S.C. 512, 354 S.E.2d 408 (Ct.App.1987). The new statute, § 6–27–840, is also very deferential to a board's findings of fact as it equates them to a jury's findings. "[T]he factual findings of the jury will not be disturbed unless a review of the record discloses that there is **no evidence** which reasonably supports the jury's findings." *Sterling Dev. Co. v. Collins,* 309 S.C. 237, 240, 421 S.E.2d 402, 404 (1992) (emphasis added) (citing *Townes Assoc's, Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976)). The distinction, if any, between an "any evidence" and a "no evidence" standard is of little importance to the instant action as our

decision, like that of the circuit court, is controlled by an issue of law.

*Id.* at 487–88, 536 S.E.2d at 895–96 (emphasis added).

## *LAW/ANALYSIS*

### I. Definition of "Use"

■ At issue is whether Heilker's outdoor display of indoor furniture is a nonconforming "use" or a "practice" associated with the operation of his businesses. To resolve this dispute, we must define the term "use" as it applies in the context of zoning. No reported case in South Carolina jurisprudence provides a definition; thus, this Court must look to the law of other jurisdictions for assistance.

■ As it is conventionally applied, the term "use" is "[t]he purpose or activity for which land or buildings are designed, arranged, or intended, or for which land or buildings are occupied or maintained." *Town of Kingstown v. Albert,* 767 A.2d 659 (R.I.2001) (quoting R.I. Gen. Laws. § 45-24-31(60)); *accord Smith v. Zoning Hearing Bd. of Huntingdon Borough,* 734 A.2d 55 (Pa.Commw.Ct.), *appeal denied* by Pa. Supreme Court, 561 Pa. 664, 747 A.2d 904 (1999), (applying the zoning board's definition of "use": "The term 'use' is defined ... as the specific purpose for which land or a building is designed, arranged, intended or for which it is or may be occupied or maintained."); *Beugnot v. Coweta County,* 231 Ga.App. 715, 500 S.E.2d 28, 30 (1998) (recognizing the definition of the term "use" created by county ordinance: "The purpose or purposes for which land ... is designed, arranged or intended, or to (for) which said land ... is occupied, maintained or leased."); *Kam v. Noh,* 70 Haw. 321, 770 P.2d 414, 416 (1989) (concluding the term "use" was synonymous with the term "purpose" in examining a zoning statute); *Croxton v. Board of County Comm'rs of Natrona County,* 644 P.2d 780, 783–84 (Wyo.1982) (employing the county commission's definition of "use" in its analysis: "The purpose or activity for which the land or structure thereon is designated, arranged, or intended, or for which it is occupied, utilized, or maintained.").

■ Case law exists that incorporates the definition of "use" found above and supports the assertion that the outdoor display of merchandise is an ***activity*** or ***practice separate***

*and distinct* from a retail establishment's "use" of its property. In *City of Columbus Board of Zoning Appeals v. Big Blue,* 605 N.E.2d 188 (Ind.Ct.App.1992), a city sought to enjoin a retail store located in the city's "C-1 Neighborhood Shopping District" from continuing its outdoor display of garden supplies. The city contended the store's practice violated the planned unit development site plan ("PUD") and the ordinance under which the PUD was adopted. The ordinance, in part, read: "The commercial uses included in the plan are limited to those permitted in the C-1 Neighborhood Shopping District." *Id.* at 191. The ordinance outlined a number of "uses permitted and specified" for a C-1 Neighborhood Shopping District. *Id.* The only "use" relevant to the parties' dispute was "retail store." *Id.*

The Indiana Court of Appeals found the PUD was completely silent concerning outside sales and storage. Regarding the ordinance, the court determined it did not reveal any restriction on outside displays by owners of retail stores. Notwithstanding these findings, the city argued "because the ordinance did not specifically permit outside displays, such *use* was therefore prohibited." *Id.* at 191 (emphasis added).

The court disagreed with the city. Relying upon *Harbour Town Associates v. City of Noblesville,* 540 N.E.2d 1283, 1285 (Ind.Ct.App.1989), which defined the term "use," as employed in the context of zoning, as "a word of art denoting 'the purpose for which the building is designed, arranged or intended, or for which it is occupied or maintained,'" the *Big Blue* Court found: ***"We cannot agree with City's inference that the term 'use' in this case should be expanded to regulate the manner in which Big Blue advertises merchandise as it operates its retail store."*** *Id.* (emphasis added).

■ Applying the definition of "use" as found within the above-cited authorities, it is apparent the Circuit Court erred in its reversal of the Zoning Board's determination. The "use" for which Heilker purchased and occupied his Beaufort properties is the retail sale of furniture. His outdoor display of furniture—a form of advertisement—is merely an activity or practice incidental to this "use."

■ This Court recognizes the term "use" has amorphous meanings in the realm of zoning. *Municipal Elec. Auth. of*

*Ga. v. 2100 Riveredge Assocs.*, 180 Ga.App. 326, 348 S.E.2d 890 (1986). In addition to the interpretation that "use" describes the actual purpose of a property, the word is also sometimes employed to refer to the types of activities, practices, and operations conducted in connection with the property's purpose. *See Recovery House VI v. City of Eugene*, 156 Or.App. 509, 965 P.2d 488, 512 n.2 (1998) ("We ... note ... that the word "use" has two different meanings, depending on the context. It sometimes refers to the actual activity that is conducted on or proposed for ... property, and sometimes to types of activities and operations that are or are not permissible in an area under zoning regulations."). We decline to integrate the latter meaning into our analysis.

Our examination of the cases that define "use" as referring to the types of activities, practices, and operations conducted in connection with the property's purpose reveal that numerous courts have relied strictly upon a dictionary or cases citing dictionaries when formulating their definitions. *See, e.g., Phoenix City Council v. Canyon Ford, Inc.*, 12 Ariz.App. 595, 473 P.2d 797, 801 (1970) (defining "use" as "the act of employing anything, or state of being employed; application; employment" by quoting *State ex rel. Mar–Well, Inc. v. Dodge*, 113 Ohio App. 118, 177 N.E.2d 515 (1960), which in turn quoted *Webster's New International Dictionary* ).

Dictionaries can be helpful tools during the initial stages of legal research. However, we are reluctant to rely upon either a dictionary or cases that have relied upon a dictionary for a definitive answer as to the definition of "use" when extensive case law exists that provides an accurate and reliable definition for the term. Our disinclination to adopt a dictionary definition is based, in part, upon persuasive commentary found in the literature.

In their recent law review article,[1] Samuel A. Thumma & Jeffrey L. Kirchmeier critique the efficacy of turning to common-usage and law dictionaries as the principal authority for defining legal terms:

Regarding common-usage dictionaries, Thumma and Kirchmeier state:

---

1. *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries,* 47 Buff. L.Rev. 227 (1999).

*[A court cannot]* *definitively rely on [common-usage]* *dictionaries as an end point in defining a word.* A descriptive dictionary sets forth definitions showing what a word may mean generally, not what a word does mean in context. Accordingly, although a descriptive dictionary may set forth possible alternative definitions for a term, it cannot provide the definitive definition for what that term actually means in a specific context. Differing definitions for a word in different dictionaries and alternative definitions of a word in the same dictionary would further confound an attempt to use a descriptive dictionary as an end point in defining a word.

47 Buff. L.Rev. at 293 (emphasis added).

The authors additionally caution against a reliance upon a law dictionary as the ultimate source for defining key terms:

*Definitive reliance* on law dictionaries to define terms suffers from defects similar to such reliance on general usage dictionaries. In addition, many terms in a law dictionary are legal terms and, frequently, terms of art. Thus, the definitions provided in a law dictionary are either: (1) based on case law or usage (such as statutory terms) or (2) created anew by the dictionary's editorial board. If based on case law or usage, the best source for a definition is the decision or usage in context. *Prior decisions and usage, defining the term in context, should be far more instructive than the definitions in a law dictionary, which are general paraphrases that lack any context.* And if, rather than being based on case law or usage, the law dictionary definition was created anew, *one might ask whether that definition should be afforded any weight at all.*

. . . .

[A]lthough perhaps a good resource for law students and lawyers unfamiliar with a term in the abstract, *law dictionaries are not particularly helpful to [a court] in determining the precise meaning of a term in context.*

*Id.* at 294 (footnotes omitted) (emphasis added).

## II. Zoning Board Determination Regarding Whether a Particular Activity or Purpose is a "Use" is a Finding of Fact

In *Stanton v. Town of Pawleys Island,* 317 S.C. 498, 455 S.E.2d 171 (1995), a homeowner sought a building permit to

repair the ground level of his oceanfront home, which was destroyed by Hurricane Hugo. The building inspector, applying the town's "Flood Damage Prevention Ordinance," denied the homeowner's request. This ordinance, enacted after the home's original erection, prohibited the construction of any ground level living quarters in the area where the home was situated. The town's zoning codes, however, permitted the rebuilding of nonconforming "uses," provided the structure requiring reconstruction was not more than 50% percent destroyed. The lower level in *Stanton* was completely destroyed; nevertheless, reviewed as a whole, the homeowner's entire structure was more than 50% intact.

The building inspector found the lower level, in and of itself, constituted a *"separate use"* from the rest of the house. *Id.* at 501, 455 S.E.2d at 172 (emphasis added). Therefore, although the entire house was not destroyed by more than 50%, the complete destruction of the lower level rendered it ineligible for reconstruction. The homeowner appealed to the town's zoning board, which upheld the permit denial. The Circuit Court affirmed.

The dispute reached the Supreme Court. Whether the town zoning board erred in concluding the homeowner's lower level was a separate "use" was the main issue before the Court. The Court articulated its standard of review:

> *The factual findings of the Board must be affirmed by the Circuit Court if they are supported by any evidence and not influenced by an error of law.*

*Id.* at 502, 455 S.E.2d at 172 (citation omitted) (emphasis added).

■ This Court reads *Stanton* to mean that in South Carolina, a zoning board determination regarding whether a particular activity or purpose constitutes a "use" of property is a finding of fact.

The *Stanton* Court reversed the town's zoning board, finding that the building inspector erred as a matter of law by severing the ground level from the entire structure during his evaluation. Conversely, in the instant case, we do not conclude there was error in the Zoning Board's findings. The outdoor display of indoor furniture is not a "use" of property.

It is a practice or activity that is a corollary of Heilker's advertising campaign.

Because the outdoor display of indoor furniture is not a "use," it cannot be a nonconforming "use"; thus, Heilker does not possess the vested right to continue this activity in violation of the Ordinance.

## CONCLUSION

■ In zoning matters, this Court is obligated to apply the extremely narrow standard of review outlined in *Vulcan Materials Co. v. Greenville County Bd. of Zoning Appeals,* 342 S.C. 480, 536 S.E.2d 892 (Ct.App.2000). The local zoning boards, and not the courts, are the primary entities responsible for the planning and development of our communities.

A "use" in the zoning context is "the purpose or activity for which land or buildings are designed, arranged, or intended, or for which land or buildings are occupied or maintained." A determination by a zoning board that a particular purpose or activity does or does not constitute a "use" is a finding of fact.

In the case *sub judice,* we rule the Circuit Court erred in supplanting the Zoning Board's finding of fact that Heilker's outdoor display of indoor merchandise was not a nonconforming "use."

For the foregoing reasons, the decision of the Circuit Court is

**REVERSED.**[2]

HUFF J., concurs.

SHULER, J., dissents in a separate opinion.

SHULER, Judge, dissenting:

I respectfully dissent. In my view, whether Heilker's placement of "indoor" furniture on the outside of his business constitutes a nonconforming "use" is a question of law for this

2. In light of this disposition, we need not address the Zoning Board's alternative sustaining grounds. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 518 S.E.2d 591 (1999) (ruling appellate court need not review remaining issues when disposition of prior issues is dispositive).

Court. Furthermore, I would find Heilker's business practice is a nonconforming use and affirm.

As an initial matter, I agree we must defer to a zoning board's factual findings if there is any evidence in the record to support them. *See Vulcan*, 342 S.C. at 488, 536 S.E.2d at 896 (describing deferential standard of review to equate zoning board's findings of fact with those of a jury, i.e., that such findings "will not be disturbed unless a review of the record discloses that there is *no evidence* which reasonably supports the [Board's] findings") (quoting *Sterling Dev. Co. v. Collins*, 309 S.C. 237, 240, 421 S.E.2d 402, 404 (1992)). However, as the majority acknowledges, it is the duty of the reviewing court to decide if a zoning board's decision is legally sound. *See* § 6–29–840 ("In determining the questions presented by the appeal, the court shall determine only whether the decision of the [zoning] board is correct as a matter of law."); *City of Myrtle Beach v. Juel P. Corp.*, 337 S.C. 157, 172, 522 S.E.2d 153, 161 (Ct.App.1999) ("[T]he determination of whether [zoning] ordinances deprive a citizen of constitutional rights is a judicial function and not legislative. And where an ordinance is clearly violative of constitutional rights, it is the duty of the court to so hold.") (quoting *Conway v. City of Greenville*, 254 S.C. 96, 101, 173 S.E.2d 648, 650 (1970)), *rev'd on other grounds*, 344 S.C. 43, 543 S.E.2d 538 (2001); *Historic Charleston Found. v. Krawcheck*, 313 S.C. 500, 505–06, 443 S.E.2d 401, 405 (Ct.App.1994) ("[W]e will not reverse ... unless the [zoning] [b]oard's findings of fact have no evidentiary support *or the [b]oard commits an error of law*.") (emphasis added).

In my opinion, whether a landowner's activities on his property constitute a nonconforming use is a question of law for the courts, because it requires an interpretation of the ordinance at issue. *See Charleston County Parks & Recreation Comm'n v. Somers*, 319 S.C. 65, 67, 459 S.E.2d 841, 843 (1995) (finding determination of council's intent in drafting ordinance was not a finding of fact because "[t]he determination of legislative intent is a matter of law"; supreme court therefore concluded the board's "determination that a park is not a municipal use under the Isle of Palms zoning ordinance" was reviewable); *see also Stanton*, 317 S.C. at 502, 455 S.E.2d at 173 (reversing the circuit court's affirmance of a zoning board determination that the lower level of appellant's house "does not constitute a separate nonconforming use from the

single structure of the entire house"); *F.B.R. Investors v. County of Charleston*, 303 S.C. 524, 402 S.E.2d 189 (Ct.App. 1991) (upon analyzing facts, court determined trial court erred in finding F.B.R. had established a nonconforming use and therefore a vested right to continue it).[3]

The majority relies on *Vulcan Materials* and *Stanton v. Town of Pawleys Island* for the proposition that a determination of use is a question of fact. In my view, these cases do not support this contention.

Without question, both *Vulcan* and *Stanton* correctly set forth the standard of review to be used in zoning cases.

**3.** Other states have held similarly. *See City of Columbus Bd. of Zoning Appeals v. Big Blue*, 605 N.E.2d 188, 191 (Ind.Ct.App.1992) ("Construction of a zoning ordinance is a question of law. Since there are no factual disputes in this case, our sole task in reviewing the trial court's decisions is to determine whether any of the zoning regulations relied upon by the City are applicable to Big Blue's operation and act to prohibit the outside displays [of merchandise].") (internal citations omitted); *Christy's Realty Ltd. Partnership v. Town of Kittery*, 663 A.2d 59, 62 (Me.1995) ("Whether a proposed use falls within a given category contained in a zoning ordinance is a question of law."); *Graham v. Itasca County Planning Comm'n*, 601 N.W.2d 461, 467 (Minn.Ct.App. 1999) ("The application of an ordinance to established facts is a question of law for the court."); *Hannigan v. City of Concord*, 144 N.H. 68, 738 A.2d 1262, 1266 (1999) ("The interpretation of a zoning ordinance and the determination of whether a particular use is an accessory use are questions of law for this court to decide."); *Davis v. Town of Stallings Bd. of Adjustment*, 141 N.C.App. 489, 541 S.E.2d 183, 186–87 (2000) (finding whether a video store fell within an ordinance's definition of "adult bookstore" was a question of law); *McMahon v. Kingston Township Bd. of Supervisors*, 771 A.2d 96, 99–100 (2001) ("Whether a ["cellular monopole"] falls within a ["semipublic use" as] specified in a zoning ordinance is a question of law and subject to review on that basis. [Since] [t]he issue is one of statutory construction, it is this Court's function to determine the intent of the legislative body which enacted the ordinance."); *Sabatine v. Zoning Hearing Bd. of Washington Township*, 651 A.2d 649, 652–53 (1994) ("The question of whether a proposed [flea market] use falls within a given category [of warehouse and wholesale trade] specified in an ordinance is a question of law."); *County of Sawyer Zoning Bd. v. State Dep't of Workforce Dev.*, 231 Wis.2d 534, 605 N.W.2d 627, 630 (Ct.App.1999) ("Once the facts are established, however, the application of those facts to the statute or [ordinance] is a question of law."); *Brooks v. Hartland Sportsman's Club, Inc.*, 192 Wis.2d 606, 531 N.W.2d 445, 449 (Ct.App.1995) ("[The] determination [of nonconforming use] involves the application of the facts to a legal standard and, consequently, presents a question of law. . . .").

Interestingly, however, in *Vulcan* this Court affirmed the circuit court's *reversal* of the Greenville County zoning board's decision denying Vulcan a "nonconforming use" certificate to continue mining its land in the face of rezoning restrictions. The County's decision was based on the testimony of Peter Nokimos, the Greenville County Zoning Administrator, who claimed he denied Vulcan's certificate application "because he found no indication of any *mining* or occupancy at the site." *See Vulcan*, 342 S.C. at 486, 536 S.E.2d at 895 (emphasis added). In affirming the lower court, this Court rejected the zoning board's determination of what constituted "mining," finding Vulcan in fact "mined" its site "as a matter of law." *Id.* at 496, 536 S.E.2d at 900. In so doing, the Court also affirmed the lower court's reversal of the zoning board's conclusion that Vulcan's activities did not constitute a protected, nonconforming use. *Id.* at 498, 536 S.E.2d at 901.

Similarly, in *Stanton* our supreme court reversed the zoning board's determination that the lower level of a beach house "constitute[d] a separate nonconforming use from the single structure of the entire house." *Stanton*, 317 S.C. at 502, 455 S.E.2d at 173. Thus, the court held the zoning board erred "as a matter of law." *Id.* at 503, 455 S.E.2d at 173. Accordingly, I believe the dispositions in these two cases lend further support to the conclusion that the determination of use is a question of law.

It is undisputed the City of Beaufort's newly amended ordinance prohibits Heilker's outdoor furniture displays. The only question, therefore, is whether his "practice" of placing indoor furniture outside is a nonconforming use under the ordinance. *See, e.g., Big Blue*, 605 N.E.2d at 192 ("The doctrine of nonconforming use is an affirmative defense asserted by a party who is alleged to be [in] violation of an existing zoning ordinance."). The majority affirms the Board's conclusion that Heilker's displays do not constitute a "use" of his property because they are "merely a practice associated with a land use." I cannot concur.

In upholding the Board's decision, the majority defines a " 'use' in the zoning context" as "the purpose or activity for which land or buildings are designed, arranged, or intended, or for which land or buildings are occupied or maintained."

While I agree this is an acceptable definition of "use," it is certainly not the only appropriate one under the circumstances. Moreover, I would find the majority's proposed definition in fact covers Heilker's practice of displaying his wares outdoors.

Here, "use" is not defined, either in the general Beaufort zoning ordinance on nonconforming use contained in the record (§ 5–6108) or the subordinate nonconforming uses section amending the "Highway Corridor Overlay Zoning" provisions of that ordinance (§ 5–6213). Although "legislative intent must prevail if it can be reasonably discovered in the language used," when interpreting an ordinance we must give words their "plain and ordinary meaning without resorting to subtle or forced construction to limit or expand" their operation. *City of Myrtle Beach v. Juel P. Corp.*, 344 S.C. 43, 47, 543 S.E.2d 538, 540 (2001); *see Somers,* 319 S.C. at 68, 459 S.E.2d at 843 ("In construing ordinances, the [undefined] terms used must be taken in their ordinary and popular meaning.").

Furthermore, "[o]rdinances in derogation of natural rights of persons over their property are to be strictly construed as they are in derogation of the common law right to use private property so as to realize its highest utility and should not be impliedly extended to cases not clearly within their scope and purpose." *Juel,* 344 S.C. at 47, 543 S.E.2d at 540 (quoting *Purdy v. Moise,* 223 S.C. 298, 302, 75 S.E.2d 605, 607 (1953)). Because no cases in our jurisdiction define the term "use," it is necessary to look to other sources for assistance.

Fundamentally, the noun "use" means "the act of using or the state of being used." *Webster's New World College Dictionary* 1574 (4th ed.1999). Moreover, in the legal arena "use" has been defined as "[a] habitual or common practice." *Black's Law Dictionary* 1540–41 (7th ed.1999); *see also Black's Law Dictionary* 1541 (6th ed.1990) (defining use as "[t]hat enjoyment of property which consists in its employment, occupation, exercise or practice."). Most specifically, in the context of zoning ordinances "use" connotes "a utilization of premises so that they may be known in the neighborhood as being employed for a given purpose.... In this context, it has been held that *'use' means what is customarily or habitually done or the subject of a common practice."* 101A C.J.S.

*Zoning and Land Planning* § 60 at 489 (1979) (emphasis added); *see also* 83 Am.Jur.2d *Zoning and Planning* § 624 at 520 (1992) (stating that "nonconforming use" includes "*conduct which is proscribed by applicable zoning restrictions*") (emphasis added).

In my view, Heilker's customary habit or practice of placing his furniture on display outdoors is unquestionably a "use" as defined above.[4] It is a way of physically using his property to advertise his business.

---

4. Other jurisdictions employ similar definitions. *See United Fed. Savings Bank v. McLean*, 694 F.Supp. 529, 537 (C.D.Ill.1988) ("[T]he word 'use' of real estate is deemed by the Illinois courts to address the purpose to which the property is put (whether it concerns issues of zoning, erecting structures on the property, the type of business for which the property is employed, *or the way in which the owner or possessor benefits from the enjoyment of the property* ).") (emphasis added); *Phoenix City Council v. Canyon Ford, Inc.*, 12 Ariz.App. 595, 473 P.2d 797, 801 (1970) (defining "use" as "the act of employing anything, or state of being employed" and finding it "obvious" that company's signs which were in process of being constructed were not being "used" at the time the restrictive ordinance was enacted); *Boss Hotels Co. v. City of Des Moines*, 258 Iowa 1372, 141 N.W.2d 541, 544 (Iowa 1966) (where city ordinance stated buyers of property "shall be obligated to devote such real property only to the *use* specified in the urban renewal plan," but did not define the term, court held hotel's use of property would not be changed by an increase in height from three stories to eight because "use refers to the activity carried on on the premises") (emphasis added); *Borough of Northvale v. Blundo*, 81 N.J.Super. 201, 195 A.2d 221, 223 (1963) ("The established concept of a 'nonconforming use' does not cover an activity simply because it takes place on the premises. It must bear a relationship to [l]and use."); *138 West 49th Street Corp. v. Hotel Coleman, Inc.*, 237 N.Y.S.2d 441, 444 (N.Y.Civ.Ct.1963) (under "Multiple Dwelling Law," " '[u]se' is interpreted to mean not an isolated act but a practice or relation"; court stated further that "[t]he term 'use' implies the doing of something customarily or habitually or making a practice of doing a certain act"); *Seckinger v. City of Atlanta*, 213 Ga. 566, 100 S.E.2d 192, 195 (1957) (defining "use" as it appeared in restrictive ordinance to mean " 'to convert to one's service' ") (quoting *Webster's Int'l Dictionary* 1684 (2d. ed.)); *American Sign Corp. v. Fowler*, 276 S.W.2d 651, 654 (Ky.1955) ("Zoning has as one of its main purposes the regulation of the *use* of property. This means regulation of the purpose or object of the use, rather than the mere conditions or circumstances of the use.") (internal citation omitted); *Durning v. Summerfield*, 314 Ky. 318, 235 S.W.2d 761, 763 (1951) (" 'Use,' in [ordinance provision on nonconforming use] means what is customarily or habitually done or the subject of a common practice."); *see generally Baltimore Heritage, Inc. v. Mayor & City*

The majority cites *City of Columbus Bd. of Zoning Appeals v. Big Blue*, a case with a strikingly similar fact pattern, as support for "the assertion that the outdoor display of merchandise is an *activity* or *practice separate and distinct* from a retail establishment's 'use' of its property." I find this case not only inapposite, but also that it lends credence to the conclusion that displaying merchandise outdoors can be a "use" in the context of zoning law.

Significantly, in *Big Blue* the Indiana Court of Appeals did not find a retailer's outdoor display and storage of goods was not a "use" of its property. Rather, the court held that where the zoning ordinance in question did not include a prohibition on selling or storing merchandise outside in its enumerated list of permitted "Uses," it would not infer an expanded meaning of the term "to regulate the manner in which Big Blue advertises merchandise as it operates its retail store." *Id.* at 191. In other words, the ordinance at issue in *Big Blue* did not reveal "any restriction or regulation on outside displays by owners of retail stores." *Id.* Notably, the court went on to state that "[b]oth zoning in general and 'uses' in particular focus on how a building or parcel of land is utilized," and ultimately concluded: "In sum, City is inviting this court to read into its ordinance a provision which is not present, namely: the prohibition of outside sales and storage of merchandise. We must decline the invitation. Zoning ordinances must be construed to favor the free use of land." *Id.* at 191–92.

Moreover, nowhere in the *Big Blue* opinion does the court conclude, or even hint, that the retailer's outdoor display was "an activity or practice separate and distinct" from its "use" of the property. To the contrary, and in direct contrast to the case at bar, the Indiana court clearly and properly limited its decision on "use" to the definitional language of the ordinance at hand.[5]

---

*Council of Baltimore,* 316 Md. 109, 557 A.2d 256, 259 (1989) (" 'Use' is a very broad concept in zoning law. . . .").

**5.** I note that, with one exception, the cases cited by the majority concern ordinances which explicitly define the term "use"; hence, these cases are facially distinguishable. Furthermore, the excepted case, *Kam v. Noh,* 70 Haw. 321, 770 P.2d 414 (1989), describes "use"

In any event, I would find Heilker's displays clearly fit within the majority's "conventional" definition of "use." Even assuming "use" can only be defined as "the purpose or activity for which land or buildings are designed, arranged, or intended, or for which land or buildings are occupied or maintained," the record clearly reflects Heilker opened his businesses and occupied his land with the *intended purpose* of advertising his merchandise through outdoor displays. Accordingly, because I believe Heilker's placement of merchandise on outdoor display constitutes an integral part of his intended purpose for each of his properties, I address the Board's alternative reasons for denying Heilker's appeal.

The concept of nonconforming use is grounded in the rule that "one's property may be continued to be used for the same purpose it was being used at the time of the passage of a [prohibitive] zoning ordinance." *Vulcan*, 342 S.C. at 499, 536 S.E.2d at 902 (quoting *James v. City of Greenville*, 227 S.C. 565, 578, 88 S.E.2d 661, 667 (1955)). Thus, the Board's contention that the City did not intend to "grandfather" existing businesses regarding outdoor displays is irrelevant.

The purpose of grandfathering in nonconforming uses is to protect the constitutional rights of the property owner. *See Friarsgate, Inc. v. Town of Irmo*, 290 S.C. 266, 269, 349 S.E.2d 891, 894 (Ct.App.1986) ("Generally, in American jurisdictions a landowner who uses his property for a lawful purpose before the enactment of zoning which subsequently prohibits that use may continue the nonconforming use.... Otherwise, the landowner would be deprived of a constitutionally protected right. The right to continue a prior nonconforming use is often stated in terms of the owner having acquired a "vested right" to continue the prior use."); *Vulcan*, 342 S.C. at 499, 536 S.E.2d at 902 ("[T]he substantial value of property lies in its use. If the right of use [is] denied, the value of the property is annihilated, and ownership is rendered a barren

as synonymous with "purpose," because other subsections of the statute in question gave the term that connotation, as did statutes construed *in pari materia. See id.* at 416 ("Where the meaning of a word is unclear in one part of a statute but clear in another part, the clear meaning can be imparted to the unclear usage on the assumption that it means the same thing throughout the statute."). *Kam,* therefore, also is distinguishable.

right.") (quoting *James v. City of Greenville*, 227 S.C. 565, 579, 88 S.E.2d 661, 668 (1955)). Thus, if it is determined that a nonconforming use existed at the time of the new ordinance, the use may continue in the absence of evidence that it is detrimental to the public welfare. *See Whaley v. Dorchester County Zoning Bd. of Appeals*, 337 S.C. 568, 578, 524 S.E.2d 404, 409–10 (1999) ("A landowner acquires a vested right to continue a nonconforming use already in existence at the time of a zoning ordinance absent a showing the continuance of the use constitutes a detriment to the public health, safety, or welfare."); *Vulcan*, 342 S.C. at 499, 536 S.E.2d at 902 ("[O]ne's property may be continued to be used for the same purpose it was being used at the time of the passage of a [prohibitive] zoning ordinance.") (quoting *James*, 227 S.C. at 578, 88 S.E.2d at 667).

Admittedly, a zoning board may regulate or proscribe changes in a nonconforming use. *See Krawcheck*, 313 S.C. at 505, 443 S.E.2d at 404. Indeed, the Board has done so here. *See* City of Beaufort Zoning Ordinance § 5–6108(d) ("A nonconforming building, structure, or land use shall not be changed to another nonconforming use."). Not every shift in activity, however, constitutes a change in use. *See City of Jewell Junction v. Cunningham*, 439 N.W.2d 183, 186 (Iowa 1989) ("[N]ot every change in particulars or details in the method of a nonconforming use or in equipment, object or processes, in connection therewith constitutes an unauthorized change in the use."). Rather, to justify finding a particular use has changed to another nonconforming use, it is generally held that the change must be substantial. *See id.* ("[C]onsiderable latitude will be allowed a landowner in making changes in the original nonconforming use if the changes are not substantial...."); *Turbat Creek Pres., LLC v. Town of Kennebunkport*, 753 A.2d 489, 492 (Me.2000) ("To qualify for 'nonconforming' or 'grandfathered' status, it must be shown that the use existed prior to the enactment of the zoning provisions prohibiting it and that the use was 'actual and substantial.'") (citation omitted); *Inst. for Evaluation & Planning, Inc. v. Bd. of Adjustment*, 270 N.J.Super. 396, 637 A.2d 235, 238 (Law Div.1993) ("The proposed use may continue so long as the continuance is 'substantially the same kind of use as that to which the premises were devoted at the time of the

passage of the zoning ordinance.' ") (citation omitted); *see also Waukesha County v. Pewaukee Marina, Inc.,* 187 Wis.2d 18, 522 N.W.2d 536, 540 (Ct.App.1994) ("[A] mere increase in the volume, intensity or frequency of a nonconforming use is not sufficient to invalidate it.).

Several states have adopted some version of the following three-part test to aid in determining the substantialness of a change in nonconforming use: whether the modified use (1) reflects the nature and purpose of the use prevailing when the restrictive ordinance took effect; (2) is merely a different manner of utilization rather than a use different in quality, character, nature or kind; and (3) has a substantially different effect on the neighborhood. *See, e.g., Turbat,* 753 A.2d at 492; *Derby Refining Co. v. City of Chelsea,* 407 Mass. 703, 555 N.E.2d 534 (1990); *Conforti v. City of Manchester,* 141 N.H. 78, 677 A.2d 147 (1996). As one court noted:

The law does not require it to be shown that each garage is used today to store exactly the same items or kinds of items which were stored prior to [the effective date of the zoning restriction]. Nor does it require that the light industry or repair work which occurs on the premises be precisely identical to what occurred before.... What is required to be shown is that the overall use of the property for the rental of facilities for storage and light industrial purposes has not been significantly altered since [that time].

*Zoning Bd. of Adjustment of the City of Philadelphia v. Libros,* 85 Pa.Cmwlth. 485, 482 A.2d 1181, 1183–84 (1984).

Applying these authorities, I do not believe Heilker's daily permutations in his outdoor display constitute a change from one nonconforming use to another. Although by Heilker's own admission the merchandise on display varies frequently, his *use* of the property for advertising purposes does not. *See Baker v. Town of Sullivan's Island,* 279 S.C. 581, 585, 310 S.E.2d 433, 436 (Ct.App.1983) (holding conversion of apartments to condominiums did not violate Town's zoning ordinance forbidding change from one nonconforming use to another because conversion would not change the property's use, i.e., "[a]fter conversion, the property would still be used for residential purposes as it was before"); *see also Motel 6 Operating Ltd. Partnership v. City of Flagstaff,* 195 Ariz. 569,

991 P.2d 272, 275 (Ct.App.1999) (holding alterations updating sign to reflect current company logos and tenants "do not trigger the loss of nonconforming use rights"); *DiBlasi v. Zoning Bd. of Appeals of the Town of Litchfield,* 224 Conn. 823, 624 A.2d 372, 376 (1993) (finding shift in use from a "business office" to a "medical office" was not sufficiently different in character to constitute a "change in use"); *Cunningham,* 439 N.W.2d at 186 ("If a grocer or other merchant is storing and selling merchandise of one type, [the] status as a nonconforming use should not be lost if he changes to another type of merchandise so long as the impact of the business on the neighborhood remains the same."); *Derby Refining,* 555 N.E.2d at 540 (in finding change from storage of gasoline, kerosene and aviation fuel to storage of liquid asphalt did not constitute a prohibited change from one nonconforming use to another, court stated the uses were "nearly identical in nature" and "the fact that the product being delivered, stored, and distributed has changed from one petroleum product to another ... does not mandate a conclusion that a change in the nature or purpose of the use has occurred"); *Kramer v. Town of Montclair,* 33 N.J.Super. 16, 109 A.2d 292, 293 (App.Div.1954) (fact that property once used for storing one-and-a-half-ton trucks now stored six-ton tractor trailer trucks was "insignificant" change such that prior nonconforming use was not destroyed);

*Stewart v. Pedigo,* 2 Ohio App.2d 53, 206 N.E.2d 429, 431 (1965) (finding change from "display of motor-driven garden and lawn tools to that of motor-driven vehicles for transportation" was not a "substantial change" in nonconforming use, because although the "purpose and policy of zoning is to effect the gradual elimination of nonconforming uses," zoning restrictions should not operate "to prohibit all changes of nonconforming use"); *Hendgen v. Clackamas County,* 115 Or. App. 117, 836 P.2d 1369, 1370 (1992) (holding no change in nonconforming use status despite rental of storage buildings to a different business storing different items because "[t]he common nucleus of both activities [is] storage"); *Libros,* 482 A.2d at 1184 (current use of premises qualified as pre-existing, non-conforming use where, although items stored in garages were newer and perhaps different, the use of the garages for personal storage had remained constant).

The Board's additional reason for denying Heilker's appeal, that existing nonconformities must be brought into compliance, to the degree practicable, "if any portion of the building, site design, or lighting is changed, expanded, or altered," also lacks merit. It is without question, and the Board concedes, that neither the "building" nor "lighting" provisions of the ordinance are implicated by Heilker's activities. Thus, the only conceivable basis for finding the above language controlling is that Heilker's rearrangement of furniture constitutes a change in "site design." I would reject this contention.

Section 5–6205 of the overlay zoning amendment defines site design as "the process of arranging buildings, parking, open spaces, and other improvements such as landscaping, walkways, and roads on the land. Site design is an art concerned with shaping functional and enjoyable outdoor spaces while working carefully with the existing landscape and community character." In my opinion, this definition may not be broadened to encompass Heilker's arrangement of furniture outside his store. The only possible construction would require a determination that his practice fell within the ambit of "arranging ... open spaces." To me, however, the arrangement of open space referenced in the amended ordinance means *where* one places "open space" in relation to buildings, sidewalks, parking, roads and other landscape features. Indeed, if Heilker's rotating displays of furniture are included in this definition, then the "space" referred to is no longer "open."

Finally, I disagree with the Board's conclusion that, because Heilker's outdoor display of furniture changes often, "conformance to the ordinance can be effected with relative ease." In so finding, the Board actually begs the question by failing to recognize that compliance would effectively destroy Heilker's use of the property. Moreover, this assertion is simply not supported by the record evidence.

The City, in its own brief, states the following:

A use of land may be continued as a nonconforming use, in spite of prohibitory zoning legislation, only if it is a "substantial" one. The nature and extent of use which will be regarded as substantial was described as one involving improvements *or businesses built up over the years, the*

*destruction of which would cause the property owner serious financial harm.*

*Final Brief of Appellant at 11* (quoting Anderson, *American Law of Zoning,* § 6.20 (1986)) (emphasis added). The record is replete with uncontradicted evidence that Heilker opened his businesses using an outdoor advertising concept and continued to build them over a period of years on that basis. Because direct testimony in the record reflects that anywhere from 25 to 35% of his sales are a consequence of this form of advertising, there is no question Heilker would suffer "serious financial harm" if forced to discontinue his displays. Thus, I would hold this factual finding by the Board is without evidentiary support.

For the foregoing reasons, I would affirm the circuit court's decision finding Heilker's nonconforming use can continue.